422 So.2d 464 (1982)
SUCCESSION OF Willard H. KILPATRICK.
SUCCESSION OF Willard H. KILPATRICK, Plaintiff-Appellee,
v.
FIRST NATIONAL BANK OF SHREVEPORT, Defendant-Appellant.
No. 15039-CA.
Court of Appeal of Louisiana, Second Circuit.
October 25, 1982.
Rehearing Denied December 9, 1982.
*466 Brown, Wicker & Amman by William D. Brown and Frederic C. Amman, Monroe, John L. Landrem, Jr., Lawrence M. Johnson, Shreveport, Whitten & Blake by Leon H. Whitten, Jonesboro, for plaintiffs-appellees, Harper Terrill and Arnold R. Kilpatrick.
Beard & Sutherland by Frederick H. Sutherland, Sockrider & Bolin by H.F. Sockrider, Jr., Shreveport, for defendant-appellant, First Nat. Bank of Shreveport.
Before MARVIN, FRED W. JONES, Jr. and NORRIS, JJ.
NORRIS, Judge.
First National Bank of Shreveport (hereinafter referred to as the "Bank") appeals a judgment upholding the validity of Willard H. Kilpatrick's nuncupative will by private act dated January 16, 1977.
The issues concern whether res judicata is applicable, whether the decedent had the capacity to make a will and whether the formalities required of this type will were observed.[1]

FACTS
This record consists of ten volumes comprising over 2500 pages and includes depositions, testimony in other courts, and other exhibits almost as voluminous as the record itself. We shall summarize some of the evidence which most favorably supports the judgment, recognizing, however, that the trial court was faced with conflicting testimony which we have also thoroughly considered in our review of this record.
Willard H. Kilpatrick, who died on February 6, 1977 was a businessman and farmer in Jonesboro. With his wife, Katherine, who died two years later, he accumulated a substantial estate, the bulk of which was community property.
Before September, 1976, Willard Kilpatrick engaged in extensive estate planning with the Bank for himself and his wife, who he believed would predecease him.
On September 16, 1976, Willard Kilpatrick executed a will naming the Bank as executor. This will bequeathed his interest in the family home and certain personal items to his wife, bequeathed ten per cent of his gross estate in cash to certain area churches, and bequeathed the remainder of his estate to the Bank as trustee of a testamentary educational foundation. On September 17, 1976, Mrs. Kilpatrick executed a similar will with the exception that her stock in the Ford dealership and all of her interest in the movables connected with the farming and cattle operations were willed to her husband.
*467 In November, 1976, Willard Kilpatrick became ill with what he first thought was a sinus infection and pneumonia producing pain in the right shoulder. After frequent visits to a Jonesboro physician, he was admitted to the Jackson Parish Hospital on December 3, 1976, for further evaluation and tests.
X-rays taken at the Jackson Parish Hospital indicated the presence of lung cancer. Thereafter, Mr. Kilpatrick was sent to M.D. Anderson Hospital in Houston for further evaluation. On December 7, 1976, Mr. Kilpatrick's brother, Arnold Kilpatrick, drove him and his sitter, Mrs. Lollie Prestridge, to Houston.
At M.D. Anderson, Mr. Kilpatrick was preliminarily evaluated, tested, and diagnosed under the direction of Dr. Clifton Mountain. Dr. Mountain determined that Mr. Kilpatrick had lung cancer which had spread to his brain and that his condition was terminal, inoperable and untreatable. After staying in Houston from December 8 through December 15, 1976, Mr. Kilpatrick was sent home and given only two or three months to live.
Mr. Kilpatrick flew home on December 16, 1976, and remained at his residence, attended by sitters, until January 8, 1977, when his condition required hospitalization in the Jackson Parish Hospital. He remained in the hospital until he died on February 6, 1977.
While in the hospital on January 16, 1977, Mr. Kilpatrick executed the will under attack. This will revoked his September 16, 1976 will, left his entire estate to his wife, Katherine, and appointed his brother, Arnold Kilpatrick, and his brother-in-law, Harper Terrill, as co-executors of his estate. On the same day, Mrs. Katherine Kilpatrick also executed another will which revoked her earlier September, 1976 will and left her estate one-half to her heirs and one-half to her husband's heirs, naming Arnold Kilpatrick and Harper Terrill as co-executors.
Two days after Willard Kilpatrick's death, his executors presented the January 16, 1977 will for probate and had themselves appointed co-executors of Willard Kilpatrick's estate.
On May 4, 1977, less than three months after the probate of the will, the Bank, the Board of Trustees for State Colleges and Universities of the State of Louisiana and the Board of Supervisors of Louisiana State University, filed a petition to annul the probated testament on grounds that on the date the will was executed Willard Kilpatrick lacked the physical and mental capacity to make a will, and additionally that the will was not executed in accordance with the requirements for a nuncupative will by private act as set forth in La.C.C. Arts. 1581 and 1582.[2]
After a ten day trial in October and November of 1981, the lower court ruled in February, 1982, that the Bank had failed to carry its burden of proving the invalidity of Willard Kilpatrick's will because of his incapacity, specifically concluding that the evidence preponderated in favor of Mr. Kilpatrick's capacity, both mentally and physically. The lower court also found that the formal requirements of law for nuncupative wills by private act had been complied with. Finally, the court dismissed the exception of res judicata filed by the Bank. This exception was based on a judgment in the Federal Court holding that Willard Kilpatrick did not have mental capacity to execute a change of beneficiary form on a life insurance policy on January 20, 1977.[3]

RES JUDICATA
At the outset, we find no error in the lower court's dismissal or overruling of the peremptory exception of res judicata. The *468 issue was not ripe for determination at the time the judgment in the lower court was rendered because the Federal Court proceeding had not then terminated in a final judgment. However, plaintiff's exhibit 51 which includes the pleadings and final judgment of the United States District Court for the Western District of Louisiana, Shreveport, Division in the captioned case, "The Travelers Insurance Co. v. The First National Bank of Shreveport, La. et al" are in the record. Since the exception was filed in the court below and since the Federal proceeding is now final, we will consider the exception of res judicata filed in this appeal.
La.C.C. Art. 2286 defines the Louisiana civil doctrine of res judicata as follows:
The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality.
La.C.C. Art. 3556(31) defines "thing adjudged":
Thing Adjudged. Thing adjudged is said of that which has been decided by a final judgment, from which there can be no appeal, either because the appeal did not lie, or because the time fixed by law for appealing is elapsed, or because it has been confirmed on the appeal.
In Welch v. Crown Zellerbach Corp., 359 So.2d 154 (La.1978) our supreme court stated:
As a result of our civilian heritage, res judicata under Louisiana law is perceived to be much narrower in scope than its counterpart in common law jurisdictions. [Citations omitted.] Louisiana legislative authority for res judicata establishes a presumption of correctness and precludes relitigation of the object of the judgment only when there is (1) an identity of the parties, (2) an identity of "cause" and (3) an identity of the thing demanded. C.C. 2285-2287, 3556(31); Mitchell v. Bertolla, 340 So.2d 287 (La.1976); Sliman v. McBee, 311 So.2d 248 (La.1975); Scurlock Oil Co. v. Getty Oil Co., 294 So.2d 810 (La.1974). The absence of any of these identities is fatal to a plea of res judicata.
There exists an identity of parties whenever the same parties, their successors, or others appear so long as they share the same "quality" as parties ...
* * * * * *
Collateral estoppel is a doctrine of issue preclusion alien to Louisiana law. Developed in the common law, the device precludes the relitigation of issues actually decided in a prior suit between the parties on a different cause of action. See Mitchell v. Bertolla, supra, and the authorities collected therein. Even among common law jurisdictions the doctrine is not applied uniformly since there are different theories on whether "mutuality" or an identity of parties is necessary. See Annot. 8 A.L.R.3d 1044 (1970).
The Bank asserts that the doctrine of res judicata or judicial estoppel is applicable here to bar this litigation in state court following a now final Federal Court judgment which held solely that Willard Kilpatrick lacked the requisite mental capacity to execute a Travelers Insurance Company change of beneficiary form on January 20, 1977.
The validity of the January 16, 1977 will was not at issue in the Federal Court because the Federal Court lacked jurisdiction to render a decree thereon. Thus, it was not a "thing demanded" or a "thing adjudged" in the Federal proceeding. To broaden the definition of "the thing adjudged" to include the Federal Court's factual finding of Mr. Kilpatrick's "permanent capacity" in relation to the change of beneficiary form would, in our opinion, subvert and be contrary to our supreme court's pronouncements on res judicata made in Welch and the cases cited therein.
Furthermore, we find no clear evidence in the Federal proceeding wherein Arnold Kilpatrick and Harper Terrill were cited as defendants in their capacities as executors of the Succession of Willard H. Kilpatrick.
*469 Although the Federal District Court judgment is rendered against them in their individual capacities, and in their capacities as co-executors for the estate of both Willard and Katherine Kilpatrick as concerns the cross-claim relating to Willard Kilpatrick's capacity from December 15, 1976 until his death on February 6, 1977, we must keep in mind that that portion of the Federal District Court's judgment was "PRUNED" by the Federal Appellate Court. Thus, the only parties to the original interpleader action concerning the validity of the January 20, 1977 change of beneficiary form, which was the only issue over which the Federal Court had jurisdiction, were the Bank and the estate of Katherine Terrill Kilpatrick.
We must therefore conclude that in the Federal proceeding, as finally adjudicated, the validity of Willard H. Kilpatrick's January 16, 1977 will was not the "thing adjudged," and that the only thing adjudged was the validity of the January 20, 1977 change of beneficiary form which was between the Bank and Arnold Kilpatrick and Harper Terrill as co-executors of the estate of Katherine Terrill Kilpatrick.
Louisiana jurisprudence is clear that res judicata is stricti juris. A final judgment has the authority of res judicata only to those issues presented in the pleadings and conclusively adjudicated by the court; and where any doubt exists, our law compels that the second suit be maintained. See McKean v. Campbell, 372 So.2d 652 (La. App. 1st Cir.1979).

CAPACITY
The Bank contends that Mr. Kilpatrick's history of careful estate planning, his setting up of an inter vivos insurance trust, his execution of the September 1976 will which left the bulk of his estate to churches and to an educational foundation, coupled with the lay testimony, expert medical testimony and medical records, establish that the January 1977 will was not one conceived and executed with sufficient mental capacity to be an unconfused decision.
On the other hand, the proponents of the will contend that the evidence adduced by them, which also consists of expert medical testimony and lay testimony, preponderates in favor of Mr. Kilpatrick's competency. They contend that the evidence shows he directed or caused the drafting of that will and executed it after he realized the fact of his impending death and the fact that he was not going to outlive his wife as he had assumed in September, 1976.
The Bank complains of the trial judge's ruling that all testimony concerning Willard Kilpatrick's estate planning and intentions prior to the September 16, 1976 will was inadmissable. The trial judge did, however, allow introduction of the prior wills and inter vivos trust confected by Mr. Kilpatrick with the aid and guidance of the Bank. Additionally, some of the testimony regarding the estate planning is contained within the record. The other evidence not admitted was proffered, and we have reviewed it. While the proffered evidence shows that Mr. Kilpatrick had a different testamentary volition from 1972 through September, 1976, we conclude that the introduction of the prior documents themselves and the evidence that was adduced at trial are sufficient to show that Mr. Kilpatrick engaged in extensive estate planning and at one time obviously desired to dispose of his estate in a different manner from that expressed in the January 16, 1977 will. Therefore, the ruling by the trial judge on the admissibility of the proffered testimony, even if error, does not compel a different result.
The rules of law are settled that testamentary capacity is tested as of the moment at which the will is made and is presumed, and that the burden of establishing the lack of capacity is on the party attacking the will. Succession of Schmidt, 219 La. 675, 53 So.2d 834 (1951); Succession of Lambert, 185 La. 416,169 So. 453 (1936); Succession of Mithoff, 168 La. 624, 122 So. 886 (1929). The degree of proof required to overcome the presumption of capacity is great and is sometimes said to be similar to that required in criminal cases, namely any reasonable doubt must be resolved in favor of the validity of the will. Succession of *470 Mithoff, supra; Succession of Schmidt, supra; Succession of Lambert, supra; Succession of Dubos, ___ So.2d ___ (La.App. 4th Cir.1982); Succession of Littleton, 391 So.2d 944 (La.App. 2d Cir.1980); Succession of Collins v. Hebert, 377 So.2d 516 (La.App. 3d Cir.1979); Succession of Patterson, 329 So.2d 925 (La.App.2d Cir.1976); Succession of Arnold, 375 So.2d 157 (La.App.2d Cir. 1979); Succession of Brown, 251 So.2d 465 (La.App. 1st Cir.1971).
The question of testamentary capacity is a question of fact; and the trial judge's findings of fact, particularly those findings involving the credibility of witnesses testifying before him, are entitled to great weight. The trial judge's conclusions as to the facts will not be disturbed unless clearly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Brown v. Dunbar, 375 So.2d 148 (La.App.2d Cir.1979); Succession of Smith, 261 So.2d 679 (La.App.2d Cir.1972).
We have reviewed this voluminous record in an effort to ascertain if the trial judge's finding of fact that Willard H. Kilpatrick possessed the necessary testamentary capacity to execute the January 16, 1977 will is clearly wrong. In doing so, we keep in mind that he had the advantage of seeing and hearing the live witnesses in making credibility evaluations.
There is certainly some evidence in the record to support the Bank's contention that Mr. Kilpatrick lacked capacity to make a will on January 16, 1977. Two eminently qualified medical doctors [Dr. William S. Fields, accepted by the court as an expert on the effects of cancer on the central nervous system, and especially the brain, but who did not see Willard Kilpatrick, and Dr. Clifton Mountain, accepted by the court as an expert in the development of the understanding of the behavior of lung cancer in man, who did treat Willard Kilpatrick for a short period of time at M.D. Anderson] opined that Willard Kilpatrick lacked the capacity to execute any legal document from December 15, 1976, until his death on February 6, 1977.
The testimony of a number of lay witnesses including Jess Lloyd, Jr., Dave Pearce, Reverend Fuller, Henry Bush, Leon Johns, Betty Britt, Dr. Charles Garrett, Julian Perry, and Lollie Prestridge, supported in different degrees the testimony of Drs. Fields and Mountain. Additionally, the hospital records of the M.D. Anderson Hospital in Houston during Mr. Kilpatrick's stay between December 8, 1976 and December 15, 1976, and the hospital records of the Jackson Parish Hospital[4] during Mr. Kilpatrick's last stay between January 8, 1977 *471 and February 6, 1977, are in part supportive of the conclusions of these doctors.
Opponent's evidence tends to depict Willard Kilpatrick from December 15, 1976 until his death as at best unable to engage in but limited meaningful conversation, at worst unable to converse at all; at best often confused as to his surroundings, at worst unaware of those surroundings; at best able to recognize at times some friends and family, at worst unable to recognize anyone; and at best critically ill with very limited mental capacity, and at worst a mere vegetable.
Proponents of the will concede the terminal nature of Mr. Kilpatrick's illness, but contend the evidence shows that although gravely ill, Willard Kilpatrick recognized and conversed intelligently with friends and family, was aware of his condition and surroundings and possessed the mental capacity necessary to make a will until shortly before his death.
Proponents of the will offered the testimony of Dr. A.E. McKeithen, Mr. Kilpatrick's personal physician in Jonesboro, who attended him after he returned from M.D. Anderson and who saw him several times a day almost every day until his death. Dr. McKeithen opined that Mr. Kilpatrick was mentally competent to make a will on January 16, 1977, and until Dr. McKeithen stopped giving him intravenous infusions some eight to ten days prior to his actual death on February 6, 1977.
Dr. James Beattie, Jr., chief director of the Memorial Sloan Kettering Center, described by him as the world's largest and "number one" private cancer research and treatment center, was accepted by the court as an expert in the diagnosis, management and treatment of pulmonary lung cancer and how it affects man. He testified that he disagreed with the lack of diagnosis and lack of treatment of Mr. Kilpatrick's illness by M.D. Anderson. Dr. Beattie, like Dr. Fields, never actually treated Mr. Kilpatrick, but nevertheless, after reviewing certain hospital records, testimony and depositions, opined that Willard Kilpatrick was capable on January 16, 1977, of having full knowledge of the import and effect of his actions in executing his will.
Bill Terrill, related by marriage to Mr. Kilpatrick, visited him at his home on three or four occasions between December 16, 1976, and January 8, 1977. He testified that Mr. Kilpatrick conversed about Terrill's family, specifically asked about Terrill's wife and inquired about her new job with the Ruston State Bank. He further testified Willard Kilpatrick recognized him on all of his visits and that they engaged in casual, normal conversation.
Madeline Foster was a sitter who sat with Mr. Kilpatrick before and after he went to Houston. According to Mrs. Foster, after returning home from Houston, Mr. Kilpatrick watched television on several occasions at home, and she remembered his specifically remarking that Lisa Todd of Hee-Haw had "pretty legs." She also said that on one occasion at home after the Houston trip, Mrs. Prestridge gave him his glasses and a newspaper and he looked at it. She recollected that he talked intelligently with different persons including his brothers, Travis and Arnold, and his niece, Lois. She specifically recalled his talking with Lois about the red convertible he gave her when she went on her honeymoon. She admitted that about half the time, Mr. Kilpatrick, during his last hospitalization, would call her "Mrs. Prestridge," but then would apologize and correct himself. She further stated that Mr. Kilpatrick had visitors in the hospital with whom he conversed. She also noted at times he seemed disoriented regarding where he was. However, she recalled having intelligent conversations with him until four days of his death. On cross examination, she admitted that her conversations in the hospital after January 8, 1977 with Mr. Kilpatrick were not extended ones and mostly concerned things he wanted her to get him.
*472 Beatrice Jones sat with Mr. Kilpatrick at the hospital. Her testimony was that he never failed to recognize her, would speak to her and ask how she was. She also stated that he would converse normally with visitors and Dr. McKeithen. She testified that the day before Willard Kilpatrick died he called for Arnold Kilpatrick.
Lazette Terrill, wife of Bill Terrill, testified that she visited Mr. Kilpatrick at home after he returned from Houston, and he inquired about her new job and her children. She visited Mr. Kilpatrick in the hospital a few days before his death and was not sure he recognized her. However, she felt that he did and that he tried to talk to her.
Susan Toms, assistant director of nursing at the Jackson Parish Hospital, testified that during Mr. Kilpatrick's first stay in the hospital she visited with him and had a number of conversations with him. She stated he seemed mentally sound, and these conversations were normal. She visited him on one occasion at home after he returned from Houston when he walked into the den with assistance and had a conversation with her about the pills he was taking and about her grandson. She did not think he appeared to be in a confused state and she helped him back to bed afterwards. During his second stay in the hospital, she visited him and conversed with him when he was not asleep when she entered his room. Shortly before Mr. Kilpatrick died, she remembered a conversation with him at a time when there were a number of visitors outside the room. On this occasion, Willard Kilpatrick called her name, and told her he was feeling terrible. When she informed him of the visitors outside the room she stated he told her "well, I'll close my eyes and you let them look in the door and tell them I'm asleep." She stated she followed his instructions.
Nurse Toms testified he never appeared to be in a confused state when she spoke to him and that his answers to her questions were intelligent. She admitted on cross examination that when she entered the room and he appeared to be asleep she would not attempt to awaken him.
Thelma Mae Anderson, also a sitter, sat with Mr. Kilpatrick from December 16, 1976, through February 4, 1977, both at home and in the hospital. On December 17, 1976, she stated Mr. Kilpatrick sat up in bed, thanked her for coming and told her how much he appreciated her assisting him. She testified that she and Mr. Kilpatrick had numerous prayer sessions during this period, usually at the beginning and end of each shift, and that during these times he asked God for forgiveness for his sins and expressed thankfulness for his blessings. She recalled Mr. Kilpatrick's asking her to make sure his brother Arnold came to see him on several occasions because he wanted Arnold to take care of some business. She talked with Mr. Kilpatrick about death. She made him coffee each morning at home, and he conversed with her each time she came on her shift. She specifically recalled conversations about politics, former governors, and churches. She testified that Mr. Kilpatrick was not confused. She particularly remembered a conversation on Christmas night of 1976 when Mr. Kilpatrick told her about having a lot of visitors that day, mostly family, and remarked that "he and Katherine had lovely families" and "I intend to see that they get what we have."
This witness further recalled an occasion in January when Mr. Kilpatrick could not be aroused one morning; this was the day he went back to the hospital. After he was admitted for his last stay, she continued to sit with him and after a few days transferred from the 11 p.m. to 7 a.m. shift to the 7 a.m. to 3 p.m. shift. She recalled that during this stay he repeated a favorite scripture she had quoted him on several occasions. She described his mental condition on the day of the will ceremony as rational and unconfused. She testified that Mr. Kilpatrick never failed to recognize her but stated he would at times pretend to be asleep when Dr. McKeithen came in and that when Dr. McKeithen left he would begin talking to her. She also recalled a conversation she had with Mr. Kilpatrick *473 concerning an automobile her sister had purchased from him. He asked her if her sister had ever received a spare tire she was entitled to and told Mrs. Anderson to tell her sister to go to the manager of the Ford dealership to tell him to give her the tire. She also recalled a conversation where Mr. Kilpatrick, while in the hospital during his last stay, awakened and she asked him if he wanted anything. He replied, "no, I can't think of a thing. I've been lying here thinking that when I get better and get out of here Sam [her husband] and I are going to carry you and Kat on an extended vacation." [Kat was his nickname for his wife.]
Harper Terrill, Wilbur McDonald, Elizabeth Alberti, and attorney William Baker, visited Willard in Houston, and Terrill, McDonald and Alberti also visited him at home and in the hospital. They were of the opinion that Mr. Kilpatrick always recognized them and was mentally competent on these occasions.
Reverend Dan Tohline, Mr. Kilpatrick's minister at the time of his last illness, testified he visited with Mr. Kilpatrick in Houston in a dark motel room when Mr. Kilpatrick was in bed. He was not sure if Mr. Kilpatrick was aware of who he was, but Mr. Kilpatrick did know Tohline was from Jonesboro and asked him how Mrs. Kilpatrick was. He stated Mr. Kilpatrick seemed very withdrawn. He talked often with Mr. Kilpatrick after he returned home from Houston and stated that Mr. Kilpatrick recognized him and asked him how he was "getting along" traveling back and forth from Jonesboro to Dallas to work on his doctorate. He visited Mr. Kilpatrick often at home and stated that these conversations many times were about the church and were rational. He conversed with Mr. Kilpatrick on the day the will was executed after the parties who witnessed the will had left the room. He stated that when he walked in, Mr. Kilpatrick immediately initiated the conversation, grabbed his hand, and told him that he was sorry that they were unable to complete the plans for the retirement home for ministers. This was a project for which Mr. Kilpatrick had provided land several months before he became ill and had discussed with Reverend Tohline. Reverend Tohline described this conversation as "very logical" and "rational" and stated that the conversation lasted about 15 minutes.
On cross examination, Reverend Tohline admitted that on some occasions Mr. Kilpatrick seemed withdrawn and unwilling to talk and that on occasions he had difficulty talking. However, he testified that on other occasions, he and Mr. Kilpatrick would have rational conversations. He found these different conditions to exist sometimes on the same day.
Arnold Kilpatrick testified that his brother, Willard Kilpatrick, was not irresponsible or irrational in Houston. He stated Willard did become unhappy and disgusted at or with M.D. Anderson. He said that the reason Willard was unable to complete the bronchoscopy examination at M.D. Anderson was because Willard was weak from not having eaten since midnight the night before and from waiting in a wheel chair at the hospital from approximately 8 a.m. until 1 p.m. He admitted that Willard did not respond when Dr. Mountain tried to talk to him on the day the bronchoscopy was attempted. Arnold disputed Dr. Mountain's testimony that Dr. Mountain tried to talk to Willard on December 15, 1976, and stated that instead, he [Arnold] went over and talked to Dr. Mountain and then came back and told Willard the bad news about his condition. He said Willard remarked "everybody's got a time to go and it looks like mine is pretty close. But I'm ready."
Arnold admitted seeing the September 1976 wills of Mr. and Mrs. Kilpatrick after he returned from Houston. He testified that Willard brought up the subject of a new will after he returned from Houston. He believed this was before Willard went to the hospital for the last time. He testified that Willard told him that he [Willard] had made a mistake, that Willard said he believed he wanted to change what he had done, and that Willard said he wanted to leave "everything to Katherine, period." He further said that Arnold would have to *474 see to it. Arnold testified he did not attempt to talk his brother out of what he had previously done and that no one could have made Willard Kilpatrick do something he did not want to do.
Arnold testified that whenever he visited his brother at home or in the hospital, Willard always talked with him rationally about family, business and other various things. He inquired if Arnold had seen about things he had requested him to do.
Arnold Kilpatrick said he told attorney Billy Baker about what Willard Kilpatrick wanted to do concerning the new will and that Billy Baker gave him instructions as how to properly prepare the will. Arnold stated he wrote the will probably on Sunday morning, January 16, 1977. Arnold said that the will constituted Willard Kilpatrick's deliberate, knowledgeable, independent, unconfused act and choice, stating that he only carried out his brother's instructions.
All of the witnesses to the will of January 16, 1977  Dr. McKeithen, Elizabeth Alberti, Dino Alberti, Woody McDonald, and Mae Anderson  as well as those present at the ceremony who were not witnesses  Harper Terrill, attorney Billy Baker, and Arnold Kilpatrick  testified that in their opinion Mr. Kilpatrick was mentally competent to execute the will on that date.
Marguerite Bond, a registered nurse and a witness for the Bank, worked the 7 a.m. to 3 p.m. shift and sometimes the 3 p.m. to 11 p.m. shift at the hospital from January 8, 1977, through February 6, 1977. During that interval, she testified that she believed Willard Kilpatrick recognized her some of the time. She related one occasion during that period when Willard obviously recognized her and initiated a conversation with her about her brother-in-law, a mechanic who used to work for Willard, commenting about his being an exceptionally good mechanic.
In effect, the Bank asserts the theory, based on certain factual occurrences, that Willard Kilpatrick's true testamentary intentions were expressed in his will of September 16, 1976, and that these intentions were deliberately thwarted by means of a planned effort led by Arnold Kilpatrick and aided, perhaps unintentionally, by Harper Terrill, Attorney Baker, Sam Donald, Dr. McKeithen, and the witnesses to the will present in Willard Kilpatrick's room on January 16, 1977, all because Arnold Kilpatrick discovered after returning from Houston that Willard Kilpatrick's September 1976 will left nothing to family members. This effort is contended by the Bank to have begun with the knowing acquisition by Arnold of a general power of attorney from an incompetent Willard Kilpatrick on December 17, 1976, pursuant to which Arnold sold the Ford dealership, bank stock, and certain other properties prior to Willard's death, and would have culminated with the feigned execution of the January 16, 1977, will by a still incompetent Willard Kilpatrick. Obviously, the lower court after hearing and observing all of the evidence and witnesses, found no such "conspiracy" to have existed. The trial judge in his "Reasons for Judgment" observed:
However, the testimony of these people who knew Mr. Kilpatrick, who have no reason to testify to anything but to the truth as they recall it, cannot be disregarded by this Court. The Court was impressed with these witnesses who knew Mr. Kilpatrick, both before and during his last illness. This Court cannot believe that these people would have taken part in the will execution ceremony if they had thought Mr. Kilpatrick did not know what he was doing.
After our review of the entire record, we cannot say that the trial court was clearly wrong in its credibility evaluation and rejection of this theory.
Considering the testimony with regard to testamentary capacity under the principles of law we have referred to, we conclude that the Bank did not bear its burden of establishing lack of testamentary capacity or of overcoming the presumption of capacity. Certainly, the evidence preponderates that Willard Kilpatrick had the requisite mental capacity on January 16, 1977, to make and execute a will. Any doubt must *475 be resolved in favor of capacity, and we cannot say the lower court was clearly wrong in its finding that appellant failed in its burden of proof.
This assignment of error is without merit.

REQUIREMENTS FOR A NUNCUPATIVE WILL BY PRIVATE ACT
La.C.C. Art. 1581, 1582 and 1595 set forth the requirements for a nuncupative will by private act.[5]
Since the bank's petition to annul the testament was instituted within three months of the date the testament was probated, the burden of proving the authenticity of the will is on appellees.
The plaintiff in an action to annul a probated testament has the burden of proving the invalidity thereof, unless the action was instituted within three months of the date the testament was probated. In the latter event, the defendants have the burden of proving the authenticity of the testament, and its compliance with all the formal requirements of the law. [C.C.P. 2932]
However, even though the burden rests upon the proponents, validity of the testament is still presumed until the contrary is established. Proof of non-observance of formalities must be exceptionally compelling in order to rebut the presumption of validity of testaments. Succession of Staggers, 254 So.2d 289 (La.App. 4th Cir.1971); Succession of Dauzat, 212 So.2d 523 (La.App. 3d Cir.1968).
La.C.C.P. Art. 2884 states what must be shown to prove authenticity and provides:
Except as provided in Article 2886, the nuncupative testament by private act must be proved by the testimony of at least three of the competent witnesses present when it was made. These witnesses must testify, in substance; that they recognize the testament presented to them as being the same that was written in their presence by the testator, or by another person at his direction, or which the testator had written or caused to be written out of their presence and which he declared to them contained his testament; and that they recognize their signatures and that of the testator, if they signed it, or the signature of him who signed for them, respectively, if they did not know how to sign their name.
Appellants question whether Willard H. Kilpatrick caused the will to be written, whether he presented the will to the five witnesses and declared that the document contained his last will, and whether he signed the will in the presence of five witnesses.
The trial judge concluded that the legal requirements for a nuncupative will by private act had been fulfilled. In Succession of Staggers, supra, at page 292, the court observed:
The issue of the execution of the will is one purely factual in nature. The trial judge, being in a position to observe the attitude and demeanor of the witnesses, is better able to make determinations of credibility and his evaluation of the testimony must be respected. Unless manifestly *476 erroneous, his findings should not be disturbed. Succession of Dauzat, supra, and Succession of Bradford, supra.
See also, Succession of Bradford, 130 So.2d 702 (La.App.2d Cir.1961).
In the instant case, Arnold Kilpatrick testified that after Willard Kilpatrick returned from Houston, he told Arnold that he wanted to undo what he had done at First National Bank in Shreveport, wanted to leave everything to his wife, Katherine, and wanted Arnold and Harper to be executors in the will. Arnold followed these instructions and wrote the will in question in his own handwriting, admittedly with the assistance of a form book and a sheet of suggestions which he obtained from an attorney. The will written by Arnold Kilpatrick did in fact undo what had been done by the First National Bank, did leave all of the property to Willard's wife, and did appoint Arnold Kilpatrick and Harper Terrill as co-executors. According to Arnold Kilpatrick, whom the trial court could believe, Willard Kilpatrick caused Arnold to write the will in accord with the desires expressed by the testator.
There is sufficient evidence to support this finding by the trial court, and we do not consider it fatal that Arnold Kilpatrick secured advice from an attorney about the form of the will.
Formal dictation of a nuncupative will by private act which the testator has "caused to be written" out of the witnesses' presence is not necessary. However, in the absence of dictation, the testator must present the testament which he has caused to be written and declare that it contains his last intentions. Such presentation and declaration admit, supply or dispense with formal dictation. Succession of Reems, 115 La. 102, 38 So. 930 (1905); Baurke v. Wilson, 38 La.Ann. 320 (1886); Wood v. Roane, 35 La.Ann. 865 (1883); Prendergast v. Prendergast, 16 La.Ann. 219 (1861).
Whether the will was adequately presented to the requisite number of witnesses and whether Willard Kilpatrick declared that the instrument was his will or was in accord with his intent, present factual issues and credibility evaluations which are best made by the trial judge.
The Bank does not contend that five competent witnesses to the will were not present in the room with the testator during the will ceremony along with three others [Arnold Kilpatrick, Harper Terrill and Attorney Baker]. The five witnesses were Dr. McKeithen, Wilbur McDonald, Elizabeth Alberti, Dino Alberti, and Mae Anderson. All witnesses agree that Wilbur McDonald, the president of a Jonesboro bank, read the will aloud to Willard Kilpatrick. Dr. McKeithen testified that after the will was read, Willard Kilpatrick was asked whether or not the will was in accordance with his wishes after which he responded "yea___yea, that's what I want."
Mr. McDonald testified that Willard acknowledged by affirmatively nodding his head that the document contained his last will in response to a question.
Elizabeth Alberti testified that Arnold Kilpatrick stated to the group that Willard had asked him to make Willard a new will, that McDonald read the will and that Arnold Kilpatrick asked Willard if he understood it and if that was what he wanted to which Willard Kilpatrick answered "yes."
Dino Alberti, Elizabeth Alberti's husband, testified he was hard of hearing and was unable to clearly hear the questions but said Arnold Kilpatrick asked questions about the will. Mr. Alberti testified his opinion was that Willard Kilpatrick knew what was going on but could not recall Willard Kilpatrick's responding verbally to the posed questions.
Mae Anderson testified that Mr. McDonald read the will to Willard Kilpatrick, and she recalled Mr. McDonald asked Willard if he understood the will, after which Willard stated he did. She recalled other questions being asked of Willard Kilpatrick but could not recall what they were.
It is settled that the presentation of a nuncupative testament by private act need not be manual. The acknowledgment of the testator that the document read contains *477 his last will implies the presentation provided for by law, even where that acknowledgment is in response to a question. Wood v. Roane, supra; Bourke v. Wilson, supra; Pfarr and Kellman v. Belmont, 39 La.Ann. 294, 1 So. 681 (1887); Succession of Guidry, 135 La. 314, 65 So. 319 (1914).
In Condon v. McCormick, 134 So.2d 619 (La.App. 3d Cir.1961), the issue was the validity of a nuncupative will by private act. The testator, as a result of a stroke or other illness, was unable to speak and needed assistance physically making his mark on the testament. The testator expressed his wishes and intentions by nodding his head in the affirmative in response to questions. After the will was read to the witnesses in the presence of the testator, the testator was asked if it was his will, and he nodded his head signifying that it was. The court found substantial and sufficient compliance with the formalities of La.C.C. 1581 and 1582, stating:
It is not necessary that there be a manual presentation of the will by the testator, as acknowledgment of the testator that the paper contains his last will implied the presentation provided by law. The testament may be written in the presence of the witnesses. Further the acknowledgment of the testator that it was his will may be in response to a question. [Citations omitted.]
* * * * * *
We are of the opinion that the testator was mentally competent and when questioned as to the named legatee, he nodded his head in the affirmative and made an effort to speak. The will was then prepared by one of the witnesses, and after the will was written in the presence of the testator and the witnesses, it was read to all of them in the presence of the testator. The testator was then asked if it was his will and he again nodded his head in approval, signifying that it was. It was signed by the testator and the witnesses in the presence of each other. We are of the opinion that this is substantial and sufficient compliance with the formalities in the above quoted codal articles as to a nuncupative testament by private act. [134 So.2d at 626.]
[See also, Succession of Rouquette, 161 La. 155, 108 So. 319 (1926), where the testator was asked after the will was read if that was what she wanted and she replied it was; Frith v. Pearce, 105 La. 186, 29 So. 809 (1900), where the testator was asked if that was what she wanted or wished after the will was read to her, and she responded affirmatively.]
We cannot say that the trial judge was clearly wrong in holding that the testimony of at least three witnesses proved that the will in the instant case was effectively presented by the testator who declared to the witnesses present that the document contained his last will and intentions.
The final contention of the Bank is that Willard Kilpatrick did not sign the will in the presence of the five witnesses. Again, we observe that the lower court obviously found that the preponderance of the testimony, after assessing its credibility, weighed in favor of the proponents of the will.
Dr. McKeithen's credibility was sorely questioned on this point. However, he identified the will and his signature and testified that he would not have witnessed it if Willard Kilpatrick had not made his mark on the will in his presence.
Mr. McDonald identified the will, his signature and testified Willard Kilpatrick acknowledged and marked the will.
Elizabeth and Dino Alberti testified to the same effect, although Dino Alberti admitted having a poor memory and being hard of hearing.
Mrs. Anderson recognized her signature on the will and stated that it had to be the one she witnessed because she only witnessed the reading and signing of one will. Her credibility too was at issue because she had testified previously in Federal Court that she thought the will was typewritten. She explained her mistake as "human error" before the state trial judge. She admitted, however, that she could not see *478 Willard Kilpatrick make his mark on the will.
The trial judge's findings of fact, particularly those involving the credibility of witnesses and the weight of testimony, are entitled to great weight, and his conclusions of fact are not to be disturbed unless clearly wrong. Again, we cannot say that the trial judge was clearly wrong in finding that at least three of the subscribing witnesses to the will saw Willard Kilpatrick affix his mark thereto.
There is ample authority that a testator of a nuncupative will by private act who can write his name can affix his mark while assisted by another when the testator is unable to sign because of a physical infirmity. Succession of Rouquette, supra; Frith v. Pearce, supra; Condon v. McCormick supra.
In Rouquette, the court said:
The testatrix knew how to write and sign her name, but she affixed her mark to the will in contest, and the reason why she did so was that she had lost the sight of one eye, and this greatly impaired the use of the other eye, which rendered it impracticable for her to write her name. Besides she was very nervous, and her hand trembled so much that she was not able to hold the pen steady long enough at a time to write her name.
We think this fully answers the objection to the will, on the score that the testatrix affixed her mark in place of writing her name.
The evidence is clear that Willard Kilpatrick was extremely ill and weak. He was unable to feed himself or get out of bed. His affixing his mark, with assistance, rather than signing his name does not invalidate the will.
Giving the trial court the great weight to which it is entitled, we cannot say that the lower court was clearly wrong in finding that the requisite formalities for a nuncupative testament by private act were met. See Succession of Bush, 223 La. 1008, 67 So.2d 573 (1953).

SUMMARY
In written reasons for judgment, the trial court discussed much of the testimony from the lay witnesses and the expert witnesses. On the strength of the testimony of the proponents' expert and of the many lay witnesses that Willard Kilpatrick could have had and did have intelligent and rational conversations after he left the Houston hospital, the trial court discounted the conclusion of the Houston experts. Their conclusion that Willard Kilpatrick could not have had and did not have testamentary capacity on or after December 15, 1976, and particularly on January 16, 1977, was considered but was not accepted by the trial court. The proponents' expert concluded otherwise. The proponents' expert testified that it was a common practice for terminal cancer patients to change their wills after learning of their terminal condition.
In this respect, we agree with the trial court's observations that it does not matter why Mr. Kilpatrick changed his will to name his wife as sole beneficiary or whether he acted wisely in so doing insofar as estate taxes were concerned. It is apparent, however, that Mr. Kilpatrick, until he knew of his terminal condition, always assumed that he would outlive his wife. He had the right to leave his property to his wife and such a bequest certainly on its face does not seem irrational, unwise, or confused.
Mrs. Kilpatrick, an original party defendant died after this action was instituted. Her executors, Harper Terrill and Arnold Kilpatrick, were substituted before this case was tried. The judgment appealed from failed to mention that the judgment was also in favor of these defendants in that capacity. We shall amend the judgment to correct this oversight.
For the reasons assigned by the Trial Court and discussed herein, the judgment is amended by adding that it is in favor of the executors of the estate of Mrs. Kilpatrick, Harper Terrill and Arnold Kilpatrick, and as thus amended, and at appellant's cost, the judgment is affirmed.
*479 AMENDED and as AMENDED, AFFIRMED.
FRED W. JONES, Jr., J., dissents and assigns written reasons.
FRED W. JONES, Jr., Judge, dissenting.
An understanding of the following significant context facts (established in the record by admissible evidence or by offers of proof of relevant evidence that should have been admitted) is essential to a proper disposition of the critical issues posed by this appeal.
Willard Kilpatrick, a wealthy Jonesboro automobile dealer with other extensive business interests, accumulated considerable property, most of which fell into the community existing between him and his wife of many years. The couple had no children and were predeceased by their parents. In 1972 Kilpatrick began consultations with the trust department of the First National Bank of Shreveport ("Bank") with reference to estate planning. A primary expressed concern of Kilpatrick was that his wife, plagued by long-term illness, should be relieved of the administration of his estate if he died before her. Consequently, upon the advice of a Shreveport attorney and personnel of the Bank's trust department, Kilpatrick executed an "interim" will to protect his wife until a detailed estate plan could be formulated for both of them.
As a further implementation of Kilpatrick's aims, in November 1972 he executed a "spendthrift" inter vivos life insurance trust, placing therein life insurance policies with a face value of some $450,000, with the Bank as trustee and his wife as the income and principal beneficiary.
In January 1976 Kilpatrick again conferred with Bank officers and trust department personnel about completing a comprehensive estate plan for him and his wife. Realizing that, if he predeceased her, Mrs. Kilpatrick would receive her half of the extensive community property and also benefit from the insurance trust, Kilpatrick explained that, in a final will, he wished to continue his established practiceof rendering financial aid to needy young people desiring a college education; to distribute a portion of his estate to area churches; and to confirm an agreement with his automobile dealership manager to acquire stock of that business. Implicit in all of this was the goal of keeping to a minimum the federal estate tax burden.
These consultations culminated on September 16, 1976 when Kilpatrick executed a comprehensive statutory will prepared by a Shreveport attorney with the assistance of the Bank's trust department. This will provided, in general, that:
(1) Mrs. Kilpatrick would receive his interest in their residence, movables therein, and other personal items.
(2) Thirteen area churches would receive, in designated portions, a cash bequest equal to 10% of his gross estate.
(3) All of the testator's shares of stock in the automobile agency would be offered for sale to Perry, the manager.
(4) The remainder of the estate would go to the Bank as trustee for "The Willard and Katherine Kilpatrick Foundation", a perpetual charitable trust, the net income of which would be used to assist young people living in the Jonesboro area to secure a college education.
(5) The Bank was designated to be Executor of the estate.
On September 17, 1976, Mrs. Kilpatrick also executed a comprehensive statutory will, prepared as a part of the described estate plan, with basic provisions complementary to those of her husband's will.
On December 2, 1976 tests conducted in Jonesboro by a local physician indicated the possibility that Kilpatrick was suffering from cancer. He was admitted to a Jonesboro hospital the following day, and immediately dictated a letter to his automobile dealership manager confirming the latter's right to purchase stock in the agency.
On December 8, 1976 Kilpatrick was admitted to the M.D. Anderson Hospital in Houston, Texas for examination and possible treatment. After extensive tests, a diagnosis *480 was made of inoperable lung cancer with probable brain metastasis. It was opined that Kilpatrick had only six to twelve weeks to live; that there was no treatment which would prolong his life; and that he should return home to spend the remainder of his days. Heeding this advice, Kilpatrick's family brought him back to his Jackson Parish residence where he remained from December 15, 1976 until he was re-admitted to the Jonesboro hospital on January 8, 1977, where he remained until his death.
When Kilpatrick re-entered the Jonesboro hospital on January 8, his treating physician noted:
"He is completely out of this world. He recognizes no one. Responds to nothing. For all practical purposes he is a vegetable..."
On January 16, 1977, in his hospital room, Kilpatrick was presented with a handwritten document in the form of a nuncupative will by private act which he allegedly executed with a weak "X" before the required five witnesses. This new will purported to revoke the 1976 will and the 1972 life insurance trust; to leave Kilpatrick's entire estate to his wife; and to appoint the testator's brother, Arnold Kilpatrick, and his wife's brother, Harper Terrill, co-executors of the will.
On January 16, 1977, Mrs. Kilpatrick also purportedly executed another will, revoking her earlier testament and leaving her estate one-half to her heirs and one-half to her husband's heirs, and designating as co-executors the same two named in her husband's alleged last will.
Kilpatrick died on February 6, 1977.
In 1978, one of the insurers of Kilpatrick's life filed an interpleader action in the U.S. District Court for the Western District of Louisiana, joining as adverse claimants the Bank and Mrs. Kilpatrick, with the latter claiming under a change of beneficiary form allegedly executed by Kilpatrick on January 20, 1977. During the course of those proceedings the Bank filed pleadings that attacked the validity of a December 1976 power of attorney executed by Kilpatrick to his brother, Arnold Kilpatrick; the January 16, 1977 nuncupative will by private act; and January 20, 1977 changes of beneficiary forms purportedly completed by Kilpatrick.
After a trial on the merits, the Federal District Judge ruled that from December 15, 1976 until his death on February 6, 1977, Kilpatrick had a permanent mental incapacity to execute any legal document, including the December 17, 1976 power of attorney and the January 20, 1977 change of beneficiary forms. However, recognizing a lack of probate jurisdiction, the judge refused to invalidate the January 16, 1977 will. This judgment was, with minor exceptions, affirmed by the Fifth U.S. Court of Appeals. 675 F.2d 633 (1982).[1]
Against this background, we turn to a consideration of the two central questions posed by this appeal: (1) Did the January 16, 1977 nuncupative will by private act conform with requirements of the law? (2) Did Kilpatrick possess the requisite testamentary capacity when he allegedly executed the nuncupative will on January 16, 1977?
I disagree with the majority's disposition of each of these issues.
Failure of Will to Meet Requirements of Law
Since this action to annul the January 1977 will was brought within three months of the date of probate, "the defendants have the burden of proving the authenticity of the testament, and its compliance with all of the formal requirements of the law." C.C.P. Art. 2932.
It is undisputed that a draft of the will in question was prepared by a Jonesboro attorney on January 15, 1977 at the direction of Arnold Kilpatrick, who copied the draft in his handwriting for presentation to his *481 brother. Therefore, the first question to be considered is whether the will proponents proved that Kilpatrick caused the will to be written, as required by La.C.C. Art. 1581. The evidence on this point, consisting solely of testimony of Arnold Kilpatrick, seems particularly weak to me. As a matter of fact, it appears that the will was caused to be written by the parties who congregated in the Jonesboro attorney's office on the day before it was presented to Kilpatrick. Further, in view of Kilpatrick's obvious physical and mental debility, it is highly doubtful that he was in any condition to originate the idea of a new will and to transmit this idea to Arnold Kilpatrick  considering that the new will would have such important implications.
Next, did the will proponents prove that Kilpatrick declared to them that the paper contained his last will? La.C.C. Art. 1581. Deno Alberti and Harper Terrill denied that Kilpatrick said anything at all during the will ceremony, merely nodding his head when asked if this was his last will. Mae Anderson said Kilpatrick replied: "I do." Elizabeth Alberti reported that Kilpatrick said "yes" twice. Arnold Kilpatrick related that his brother said that he understood why the people were present and replied "yes" and "no" during the ceremony.
It was equally conceded by the witnesses that because of Kilpatrick's weakened condition, Arnold Kilpatrick had to hold and guide the testator's elbow while he made his "X".
As a general rule, formal legal requirements for the execution of nuncupative testaments must be strictly observed, and a material deviation from those requirements renders a will invalid. Succession of Dubuisson, 378 So.2d 1049 (La.App.2d Cir. 1980).
It is recognized that some minor deviation from those requirements have been permitted (such as nodding one's head in response to questions) when it was clear that the intent of the testator with reference to will preparation had been carried out. However, each case must be viewed in its own particular factual context to ascertain that the testator clearly indicated, in an appropriate manner, that the paper presented to him incorporated his desires with reference to the disposition of his estate.
In view of the questionable circumstances surrounding the preparation of this will, together with the conceded fact that Kilpatrick was too weak to sign his name or even to hold the pen without assistance, common sense dictates that we give careful scrutiny to the will ceremony and require clear evidence that the testator declared to the witnesses in some unequivocal fashion that the document (prepared by someone else) was actually his last will. In my opinion, the will proponents failed to discharge their burden of proof on this point.
For these reasons, I would hold that the defendants did not prove "the authenticity of the testament, and its compliance with all of the formal requirements of the law." Consequently, on this basis the questioned will should be declared invalid.

Lack of Testamentary Capacity
The true test of testamentary capacity is whether at the time of making the will the testator is of sufficient mind to understand the nature of the testamentary acts and appreciate their effects. Succession of Moody, 227 La. 609, 80 So.2d 93 (1955).
The question is: did the testator "have the mental and emotional capacity to deliberate his actions knowledgeably and act independently to make an unconfused decision?" Succession of Dixon, 269 So.2d 323 (La.App.2d Cir.1972).
While testamentary capacity is always presumed, the party attacking the will may prove by satisfactory and convincing evidence that the testator was not of a sufficiently sound mind to fully comprehend the nature of the testamentary acts and to appreciate their effects at the time of the making of the will. Succession of Kelly, 305 So.2d 704 (La.App.2d Cir.1974).
My review of the record leads to the conclusion that the will opponents fully discharged their burden of proving Kilpatrick's lack of testamentary capacity on *482 January 16, 1977, when he allegedly executed the nuncupative will.
I am particularly impressed with the records of the Jonesboro hospital which clearly revealed a progressive degeneration in Kilpatrick's condition, both physical and mental, during his terminal confinement. At 2:30 o'clock P.M. on the day Kilpatrick purportedly executed the will (between 1:00 and 2:00 o'clock P.M.), the nurse noted that her patient appeared in a semi-comatose condition.
Of particular significance is the fact that not one of Kilpatrick's attending nurses who testified at the trial was of the opinion that he was mentally competent during his last stay in the hospital.
Dr. Mountain, Chief of Thoracic Surgery at M.D. Anderson Hospital and Kilpatrick's examining physician at that renowned institution, found that his patient was suffering from advanced inoperable lung cancer which had metastasized to the brain. This highly qualified expert witness testified that on December 15, 1976, Kilpatrick was unable to make a rational choice or judgment; was unable to deliberate his actions knowledgeably and to independently make an unconfused judgment; and that Kilpatrick's physical and mental condition would have continued to decline until his demise. In summary, he stated that Kilpatrick no longer had the capacity for reasoned judgment since he could not perceive and distinguish relationships and alternatives; could not concentrate; and could not process information.
The testimony of Dr. Mountain was corroborated by that of Dr. Field, certified neurologist and psychiatrist. This witness testified unequivocally that on December 15, 1976, Kilpatrick did not have the mental or emotional capacity to deliberate his actions knowledgeably and to independently make an unconfused judgment.
In rebuttal, the will proponents presented a series of witnesses, including several of the "sitters" who testified in substance that during his final stay in the hospital Kilpatrick would, from time to time, speak, watch television and appear to be alert. It is noteworthy that one of those witnesses, the Methodist minister, said that sometimes Kilpatrick's eyes were open but he seemed unaware of conditions around him; at other times he was awake and would talk; at other times he would be asleep; and all three conditions might exist on the same day.
It seems to me that resolution of this issue transcends the question of witness credibility  in which great weight is given to the trial judge's assessment. Accepting as true the testimony of the witnesses presented by the will proponents, I do not believe that they refuted the opponents' evidence that on January 16, 1977 Kilpatrick did not possess testamentary capacity.
In this context, the history of Kilpatrick's estate planning and his oft expressed goals appears particularly relevant. It is obvious that the September 1976 will met his articulated concerns. If he predeceased his wife, she would automatically receive her half of the sizable community. Therefore, he bequeathed his half to designated causes in which the testator had long been interested  assistance to needy young people and contributions (amounting to the traditional tithe) to a number of local churches.
It is also noteworthy that, upon learning he had cancer, Kilpatrick's first act was to write a letter to his automobile agency manager confirming their stock agreement  just some 45 days prior to the date of the new will.
Then, according to the will proponents, Kilpatrick suddenly decided, while in the final stage of a terminal illness, to destroy the product of countless hours of detailed discussions involving the wise disposition of his large estate simply "to take care of his wife." This was in fact the primary goal of all that estate planning, initiated and conducted by an astute businessman then in full possession of his faculties.
A normal person is presumed to desire the natural consequences of his actions. Since we cannot probe the inner recesses of a person's mind and observe his mental processes, this is one strategem for attempting *483 to discern intent. Where the natural consequences of an act plainly are subversive of and counterproductive to a testator's best interests, surely the performance of that act is indicative of a confused decision based upon faulty perceptions  or demonstrative of lack of testamentary capacity.
On January 16, 1976, Kilpatrick obviously had forgotten that he had already "taken care of his wife" through meticulous estate planning. In addition to receiving her half of the community, she was a designated legatee in her husband's will and also the beneficiary of a substantial life insurance trust. The purpose of the trust was itself to protect Mrs. Kilpatrick, since her husband at that time recognized her inability to manage sizeable funds and sought to assure that she had the benefit of trained, qualified counselors.
Not only did the new will purport to divest Mrs. Kilpatrick of this protection, but it burdened the testator's estate with very heavy federal estate taxes  which the estate planning was also designed to avoid. The sad irony is that, as pointed out to us in companion proceedings involving claims for astronomical attorney fees and expenses, the Kilpatrick estate may now be on the verge of bankruptcy.
Did Kilpatrick on January 16, 1977 fully comprehend the nature of his testamentary act and appreciate its effects? The answer seems self-evident to me  and, of course, it is in the negative.
I would invalidate the January 16, 1977 nuncupative will, not only because it was not completed in accordance with the law, but also because the testator lacked testamentary capacity.
For these reasons, I respectfully dissent.
NOTES
[1] The Bank assigns these errors:

A. The trial court committed error by finding that the will was executed in accordance with the formalities required by law for nuncupative wills by private act;
B. in finding that the Bank failed to prove decedent's testamentary incapacity; and
C. in excluding important and admissible evidence of decedent's estate planning, state of mind, and lack of intent to destroy the estate plan he and his wife had formulated over a significant period.
[2] An exception of no cause and no right of action to the petition to annul the probated will was sustained by the district court as to all plaintiffs but this decision was reversed by this court as to the Bank only. See Succession of Willard H. Kilpatrick, 356 So.2d 1083 (La. App.2d Cir.1978).
[3] Additionally, the Bank filed in this court a peremptory exception of res judicata and plea of judicial estoppel based on the proceeding entitled Travelers Insurance Co. v. First National Bank, Etc., 675 F.2d 633 (CA 5 1982).
[4] The Bank places much reliance on the Jackson Parish Hospital records during Willard Kilpatrick's last stay and upon the notes and testimony of the nurses who attended him there. Admittedly, the nurses were not in constant contact with Willard as were his around the clock sitters, since the nurses were only in and out of his room every couple of hours and there for only short periods of time.

The evidence in this case indicates that Kilpatrick was discharged from the hospital to go to M.D. Anderson on December 7, 1976, and was not readmitted to the hospital until January 8, 1977. Dr. Firnberg's interval note, which is relied upon by the Bank to describe Willard Kilpatrick as a "vegetable," and incapable of recognizing anyone was purportedly written on the date of his re-entry to the hospital. However, the note itself is ambiguous as to the date of re-entry and can be construed to mean that Willard Kilpatrick had already been to M.D. Anderson prior to "re-entering" the hospital on December 3, 1976. However, we can only conclude that the December 3, 1976 date as the re-entry date in Dr. Firnberg's note is simply "human error." The nurses' notes from December 3, 1976 through December 7, 1976 are replete with information that shows Willard Kilpatrick was not then a "vegetable" because they describe him denying pain, complaining of pain, requesting medication, going to x-ray in a wheel chair, sitting up, watching television, being cheerful at times, being depressed at times, having a fair to good appetite, and leaving on December 7, 1976 with relatives to go to M.D. Anderson.
Likewise, after his re-entry on January 8, 1977, the nurses' notes contain information that would certainly contradict the "vegetable", "completely out of this world", condition described by Dr. Firnberg. There are notations describing Willard Kilpatrick between January 8, 1977 and February 5, 1977 as complaining of headaches and other discomforts; registering no complaints; eating poorly, not at all at times, but eating well at others; talking to express his needs; requesting that his wife be called to come and see him; responding to conversations; recognizing people; commenting on how he felt and slept and on the quality of the food; and being more alert at some times than others.
[5] The applicable articles provide:

A nuncupative testament, under private signature, must be written by the testator himself, or by any other person from his dictation, or even by one of the witnesses, in presence of five witnesses residing in the place where the will is received, or of seven witnesses residing out of that place.
Or it will suffice, if, in the presence of the same number of witnesses, the testator presents the paper on which he has written his testament or caused it to be written out of their presence, declaring to them that that paper contains his last will. [Art. 1581]
In either case, the testament must be read by the testator to the witnesses, or by one of the witnesses to the rest, in presence of the testator; It must be signed by the testator, if he knows how or is able to sign, and by the witnesses or at least by two of them in case the others know not how to sign, and those of the witnesses who do not know how to sign, must affix their mark.
This testament is subject to no other formality than those prescribed by this and the preceding article. [Art. 1582]
The formalities, to which testaments are subject by the provisions of the present section, must be observed; otherwise the testaments are null and void. [Art. 1595]
[1] Although I agree with the majority that the plea of res judicata filed in this court, based on the federal court proceeding, should be overruled, the construction given by another tribunal to these context facts is of interest.