376 So.2d 589 (1979)
SUCCESSION of William Houston WRIGHT.
No. 10315.
Court of Appeal of Louisiana, Fourth Circuit.
October 10, 1979.
Charles A. Kronlage, Jr., Kronlage, Dittmann & Caswell, New Orleans, for plaintiff-appellee.
A.D. Freeman and Charlotte A. Hayes, of Satterlee, Mestayer & Freeman, New Orleans, for defendant-appellant.
Before SAMUEL, GULOTTA and GARRISON, JJ.
GULOTTA, Judge.
In this will contest the proponent, William Fain Wright, a major child of the decedent, appeals from a judgment declaring null and void a statutory will prepared in accordance with R.S.9:2442. The will was executed on July 10, 1977 at approximately 8 p. m. and the testator died on July *590 11, 1977 at 9:25 p. m. The decedent had been admitted to Mercy Hospital on July 5, 1977 for treatment of a terminal cancer illness. We affirm.
Decedent had been married twice. From the first marriage one child was born, William Fain Wright (hereinafter referred to as proponent). Decedent was married the second time for twenty-two years to Mildred Richard Wright, (hereinafter referred to as the opponent), with whom he was living and residing at the time of his death. According to the testimony of proponent, he had lived with his father and the opponent from age five until his marriage at age nineteen.
In an earlier July 25, 1963 will, the opponent had been bequeathed an undivided two-third interest in all of decedent's "separate or community" property and had been named executrix. The proponent had been bequeathed in that will the remaining undivided one-third interest. By the terms of the July 10, 1977 will, after making special bequests, decedent left the remainder of his estate to his son. The usufruct for life of the decedent's community interest in the family home was bequeathed to his wife. The proponent was named executor of the estate.
The thrust of the opponent's attack on the validity of the July 10th will is twofold: 1) that the will is defective as to form and does not comply with the requirements of R.S.9:2442; and 2) that decedent lacked testamentary capacity to make a will at the time the will was confected. In his reasons for judgment, the trial judge concluded that the will was not made in accordance with the requirements of the statute and also that the testator lacked testamentary capacity at the time the will was made.
Because we conclude the record clearly supports the trial court's conclusion of lack of testamentary capacity, we find no necessity of discussing whether or not the will complied with the formal requirements of the statute.
Well established is the rule that testamentary capacity is presumed and a person attacking the will has the burden of showing lack of capacity at the time the will was executed. McCarty v. Trichel, 217 La. 444, 46 So.2d 621 (1950); Succession of Zinsel, 360 So.2d 587 (La.App. 4th Cir. 1978), writs refused, 363 So.2d 72 (La.1978); Succession of Montero, 365 So.2d 929 (La. App. 4th Cir. 1979); Succession of Chopin, 214 So.2d 248 (La.App. 4th Cir. 1968). Furthermore, the determination of testamentary capacity is a factual question and the findings of the trial judge are not to be disturbed unless manifestly erroneous. Succession of Staggers, 254 So.2d 289 (La. App. 4th Cir. 1971) writ refused, 260 La. 11, 254 So.2d 617 (1971).
Undisputed is the fact that decedent, at the time of his hospitalization on July 5, 1977 for his last illness, was ravaged with terminal cancer. As far back as September 1976 Doctor Carl S. Merlin, decedent's treating physician (who did not testify at trial but whose deposition was admitted) detected cancer of the lung. According to the doctor at the time of admission to the hospital decedent appeared to be in a pre-terminal condition, and was suffering a great deal of pain, requiring heavy sedation. According to decedent's wife, Mildred, her husband had been in the hospital approximately seven times in the sixteen months preceding his death. Two surgical interventions for cancer had been performed.
According to Dr. Merlin, during "the last couple of days" of decedent's life he was in severe pain and required a great deal of sedation. Dr. Merlin indicated that because of the realization that decedent was obviously close to death he saw no reason to wake him and did not converse with decedent on the 10th or 11th of July. According to Merlin, decedent was rational in that he understood where he was, why he was there, and that he needed pain killing drugs.
The death summary dated July 18, 1977 stated that decedent "went into a coma on 7/9/77 and quietly expired 7/11/77." Dr. Merlin explained that apparently decedent did awake intermittently for the purpose of *591 asking for pain medication. After testator remained in the hospital for two or three days, according to Dr. Merlin, he probably didn't know what day it was. The doctor explained further that deterioration of the organs, as in decedent's case, would allow for a longer effect of sedatives on such a patient. Although the doctor could not indicate, to a reasonable medical certainty, that decedent did or did not have sufficient mental capacity, he did state that decedent's preoccupation with pain was such that he could not have made a new will without it being recommended by someone else.
Dr. John Adrianni, a Clinical Pharmacologist, testified (after having read the hospital charts and records), that decedent "was not capable of signing anything that would be in the nature of a legal document or where judgment is required . . ." According to Dr. Adrianni the nature and extent of the potent narcotics required to sedate decedent were such that his ability to judge, think and discern would be affected. The doctor went on to explain that it was indeed possible for a person under the influence of these drugs to answer a question and "not know exactly what he is answering."
The practical nurse who attended decedent on the 7 a. m. to 3 p. m. shift stated that decedent was so weak at approximately 2:30 on the afternoon of July 10th that he was unable to take any medication by mouth. She added, however, that he was definitely not comatose on July 8th and 9th.
The 3 p. m. to 11 p. m. shift nurse stated that on July 10th there were many visitors in the room and the testator was not comatose. She added that he was awake when the visitors were at his bed side but she did not observe whether he was alert and rational. Her chart notation described decedent's condition on July 10th, at the time the visitors were in the room, as "poor". She did say that after the visitors left the room the patient was awake enough to ask for pain medication. This was about 9 p. m. on the night of July 10th.
The 11 p. m. to 7 a. m. shift nurse stated that perhaps four or five nights before the decedent died, "he really wasn't lucid". According to this nurse he became worse day by day. This nurse added that upon arrival at the hospital the patient would respond affirmatively to inquiries concerning pain. However, the last three or four nights decedent looked as if he was almost comatose. She stated that she did not think decedent was capable of understanding and making a last will and testament.
Present in the hospital room at the time of the making of the will were the proponent, proponent's wife, the Notary and three persons who witnessed the will. All of the witnesses to the will, including the Notary, stated that decedent acknowledged their presence in the room and greeted them at the time they entered. According to one witness, the Notary read each paragraph of the will and decedent indicated by head movement that he understood and approved of its terms. This witness also stated that when the Notary asked questions of the decedent, proponent's wife would repeat the question to make certain decedent understood. On occasions the decedent nodded his head in affirmation and on other occasions indicated with a "yes". According to the witness, the proponent's wife (decedent's daughter-in-law) held decedent's hand while he executed an "x" on the will. Because of weakness decedent could not sign his name.
The remaining two witnesses to the will generally corroborated the testimony of the first witness. One of the witnesses did add, however, that after the will was read to the decedent, he asked his son "is this what we want, Billy?" The third witness did state that the will was read to decedent and that he knew what was going on.
Although the proponent's wife acknowledged that she placed her hand over the knuckle of decedent's writing hand when he executed the "x", both she and the testator's son testified that decedent was awake at the time of the writing of the will and that he understood its content.
*592 Decedent's sister, who visited and stayed with decedent at night, indicated that his conversations were sensible between July 5th and July 11th. The opponent, who stayed with decedent from 8 a. m. to 8 p. m. daily from the time of admission until his death, indicated however decedent was awake only to ask for medication; that he moaned and slept "most of the time". She stated that on the 10th of July she had been with decedent from 8 a. m. to 8 p. m.[1] and when she left the hospital decedent was "knocked out".
Finally, the Notary who confected the will stated that she had made an attempt on July 9th to write the will, but found decedent sleeping, apparently from the effects of morphine. She prepared the will in accordance with the wishes of the proponent, who stated that he was relating the decedent's wishes to her. She stated that she had not met decedent before the day the will was confected. The Notary stated that she read the will to decedent and after each paragraph he indicated approval. She testified that decedent was "totally alert the entire time."
Testimony of other witnesses was not significant in the ultimate determination of testator's mental capacity.
It is apparent from a consideration of the evidence that the trial judge was confronted with diverse, and at times, contradictory testimony. It is also significant that the strongest evidence of decedent's alertness and ability to understand the nature of the confection of the will came from those witnesses who were interested in maintaining the testament. This is not to impugn that testimony, but only to recognize that the trial judge apparently placed more reliance on the testimony of Drs. Adrianni and Merlin, as well as on two of the three nurses in attendance.
When we consider the evidence we are lead to conclude, as did the trial judge, that decedent lacked testamentary capacity at the time of the making of the will.
Accordingly, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] Decedent's wife was not present when the will was executed. She had left the hospital shortly before the Notary and witnesses came into decedent's room for the purpose of executing the will.