478 So.2d 243 (1985)
SUCCESSION OF Salvador CAPRITO, a/k/a S. Caprito, Joseph T. Caprito, et al., Plaintiffs-Appellants,
v.
James MAYHEW, et al., Defendants-Appellees.
No. 85-634.
Court of Appeal of Louisiana, Third Circuit.
November 7, 1985.
*244 Sanders & Owens, Alan Sanders, Orange, Tex., for plaintiffs-appellants.
Humphries & Humphries, Guy E. Humphries, Jr., Alexandria, for defendants-appellees.
Before GUIDRY, STOKER and KING, JJ.
STOKER, Judge.

HISTORY OF THE CASE
This litigation was initiated as an action to annul the probated testament of Salvador Caprito. The plaintiffs basically raised three issues: (1) whether the Louisiana court had jurisdiction to probate the will, (2) whether the testamentary formalities were adhered to, and (3) whether the deceased had the mental capacity to execute a will. The trial court held the will to be valid. On appeal we reversed the trial court and held that the district court of Rapides Parish lacked jurisdiction to probate the will. Succession of Caprito, 458 So.2d 588 (La.App. 3d Cir.1984). We did not address the merits of the case at that time. The Supreme Court granted the defendants' application for writ of certiorari and reversed our ruling. Succession of Caprito, writ granted, 462 So.2d 1242 (La. 1985), reversed and remanded, 468 So.2d 561 (La. 1985). The Supreme Court held the deceased, Salvador Caprito, was a Louisiana domiciliary at the time of his death, thus the court had jurisdiction to probate the will. The court remanded the case to us to consider the remaining issues involving the validity of the will and Caprito's mental capacity to execute the will.
*245 The plaintiffs in this will contest are Marguerite Caprito Dial and Joseph T. Caprito, the niece and nephew of Salvador Caprito. The defendants and proponents of the will at issue are Gertrude Caprito Daily, represented by her daughter and duly appointed guardian, Helen Vaughn, and James C. Mayhew, a/k/a Noel Caprito, who are the daughter and son of the testator.

FACTS
The testator, Salvador Caprito, was born December 21, 1883, in Franklin, Louisiana, and died March 9, 1982, in Rapides General Hospital, Alexandria, Louisiana, at the age of 98. He was an unusual man who lived a rather solitary life. He amassed a substantial fortune during his life and while he lived a rather meager life, he made generous donations of huge amounts of money and valuable properties to persons and charities throughout his life. The latter part of his life, until he was in his nineties, was spent living in hotels with all of his belongings carried in a suitcase.
He had been married at one time to Annie Ehrhardt, later Mayhew. The marriage ended in divorce in Dallas, Texas, on December 14, 1915; however, there were two children born of the marriage. The defendant, Gertrude Caprito Daily was born during the marriage and the defendant, James C. Mayhew, a/k/a Noel Caprito, was born shortly after the divorce. Neither plaintiffs nor defendants had any contact with the deceased until he was an elderly man.
Nothing much is known about the decedent up until about 1955. He seems to have lived and conducted most of his business from 1955 to 1977 in Fort Worth, Texas. It was there in 1963 that William McKinney, an accountant, began keeping his books and assisting Salvador Caprito in handling his business affairs. In June, 1977, McKinney brought temporary guardianship proceedings against decedent and was named temporary guardian in July, 1977. At that time the testator was living with plaintiff J.T. Caprito in Franklin, Louisiana.
In October of 1977, Salvador Caprito executed a will in Texas, leaving his entire estate to the plaintiffs, Marguerite Caprito Dial and J.T. Caprito. In January, 1978, Mrs. Dial was named guardian over the person and estate of testator pursuant to the ruling of a Texas court in a permanent guardianship hearing held in December, 1977. Testator lived with Mrs. Dial until he fell and broke his hip in 1981. She was paid $891 per month to care for the decedent. This amount was later increased to $961.
Defendant Gertrude Caprito Daily's daughter, Helen Vaughn, applied to the court to replace Mrs. Dial as testator's guardian in April, 1978. The court granted the change in guardianship in June, 1978. She resigned in favor of her uncle, James C. Mayhew, in November, 1978. He remained the testator's guardian until testator's death in 1982. Mr. Mayhew had the testator moved to Hilltop I Nursing Home in Pineville, Louisiana in January, 1982, after hip replacement surgery in Lake Charles. On February 16, 1982, the testator executed a new will leaving his entire estate to his son and daughter, the defendants in this suit. Salvador Caprito died in Rapides General Hospital on March 9, 1982.
It is the will executed on February 16, 1982, which is at issue. The only questions which are before us for review concern the validity of the will and the mental capacity of the testator. Whether or not the formalities have been met in executing the will and whether or not the testator has the mental capacity necessary to execute a will are both questions of fact to be answered by the trial judge. It is well accepted jurisprudence that these factual decisions will not be disturbed unless they are clearly and manifestly erroneous. Succession of Barbe, 301 So.2d 711 (La.App. 3d Cir. 1974). We find no error, thus we affirm.

FORMALITIES
The will was confected pursuant to LSA-R.S. 9:2443 which provides for a statutory will for those with sight impairment or those who are illiterate. The will contains *246 a declaration by the testator that he could not read or sign his name because he had broken, lost or misplaced his prescription glasses. The requisite formalities are clearly stated and in 1982 when the will was executed read as follows:
"§ 2443. Statutory will for those with sight impairment or those who are illiterate
A. A statutory will may be executed under this Section by a person whose sight is impaired to the extent that he cannot read or who does not know how to read.
B. The statutory will shall be prepared in writing and shall be dated and executed in the following manner:
(1) The will shall be read aloud by the notary in the presence of the testator and three competent witnesses, and the witnesses shall follow the reading on copies of the will.
(2) After the reading, the testator shall declare or signify to them that he heard the reading and that the instrument is his last will and shall sign his name at the end of the will and on each other separate page of the instrument. If the testator cannot sign his name, he must so declare or signify to the notary in the presence of the witnesses and declare or signify the cause that hinders him from signing, and shall then affix his mark in the places where his signature is required.
(3) In the presence of the testator and each other, the notary and the witnesses shall then sign the following declaration, or one substantially similar: "Read aloud by the notary in the presence of the testator and each other, such reading having been followed on copies of the will by the witnesses, signed at the end and on each other separate page, (or if not signed by the testator, the statement of his declaration or signification that he cannot sign his name and of the cause that hinders him from signing) and declared or signified by testator, in our presence, to be his last will and testament, and in the presence of testator and each other we have hereunto subscribed our names on this __ day of __________, 19__."
C. A competent witness for the purposes of this Section is a person who meets the qualifications of Civil Code Articles 1591 and 1592, and who knows how to sign his name and to read the will as written and is physically able to do both.
D. The statutory will authorized by this Section may not be executed in braille or other similar mode of expression."
On the face of the will itself the formalities have been met. Plaintiffs seem to argue that the witnesses should have a complete and exact recollection of the events surrounding the execution of the will. Since the will was attacked within three months of the death of the testator, the burden of proving that the formalities had been met were on the proponents, defendants in this case, of the will. LSA-C. C.P. art. 2932. The trial judge correctly stated that it would be a ridiculously high burden to expect the witnesses to have a complete and independent recollection of every event which occurred at the signing of the will. Riedel, et al v. Sharp, 386 So.2d 1066 (La.App. 3d Cir. 1980). All of the witnesses testified to the reading and signing of the will. They recognized the signatures and testified that they signed in each other's presence. The trial judge found "the evidence presented by defendants amply support a determination that the will was executed properly."
While the proponents in this case have the burden of proving that the formalities have been followed, their task is eased by a presumption in favor of the validity of testaments in general. In Succession of Kilpatrick, 422 So.2d 464 (La.App. 2d Cir. 1982), writ denied, 429 So.2d 126 (La.1983), the court explained at page 475:
"However, even though the burden rests upon the proponents, validity of the testament is still presumed until the contrary is established. Proof of non-observance of formalities must be exceptionally *247 compelling in order to rebut the presumption of validity of testaments. Succession of Staggers, 254 So.2d 289 (La.App. 4th Cir.1971); [writ not considered 254 So.2d 617 (La.1971)] Succession of Dauzat, 212 So.2d 523 (La.App. 3d Cir.1968)."
In this case all three witnesses and the notary testified to the circumstances surrounding the execution of the will. The trial judge, after observing their attitude and demeanor, determined that the formalities had in fact been followed.
Plaintiffs also complained that the testator had not declared that he could not read and sign the will. The trial judge held: "the testimony of the witnesses and the notary (along with the express declaration of the testator in the attestation clause of the will) is sufficient evidence to prove that the testator did indeed signify in some way the reason for not reading the instrument himself and for his inability to sign his own name." The trial court held that the statutory will formalities of LSA-R.S. 9:2443 were met and since we find no error we will not disturb that decision.

MENTAL CAPACITY
Plaintiffs also argue that Salvador Caprito lacked the mental capacity to execute the will of February 16, 1982. The burden of proving lack of capacity is on the party seeking to annul the will on that ground. The standard of proof imposed on the claimant is to prove incapacity by clear and convincing evidence. Succession of Lyons, 452 So.2d 1161 (La.1984); Succession of Poynot, 461 So.2d 1070 (La.App. 4th Cir.1984), writ denied, 466 So.2d 468 (La.1985). In the face of a strong presumption in favor of mental capacity, that burden is heavy.
Testamentary capacity should be tested as of the time the will was executed. LSA-C.C. art. 1472; Stewart v. Branch, 250 So.2d 474 (La.App. 1st Cir.1971), writ denied, 259 La. 905, 253 So.2d 224 (1971). Therefore, the fact that a person is interdicted does not in and of itself prevent a person from executing a will. The will may be valid if executed during a "lucid interval." Succession of Lanata, 205 La. 915, 18 So.2d 500 (La. 1944).
The only expert testimony was from Dr. Ordinario who had been the testator's physician while he lived in Lake Charles. It was his opinion that the testator was suffering from organic brain syndrome, which is a deterioration due to age. It was his testimony that this condition caused confusion and disorientation. But, he also testified that on the many occasions when Salvador Caprito had been hospitalized, he had been confused and disoriented when he entered the hospital, but that this condition would clear up. By the time he was discharged he was alert and lucid. It is important to note that Dr. Ordinario did not have any contact with the testator after he left the hospital in Lake Charles, thus he could not testify, beyond mere speculation, to the mental condition of the testator on the day the will was executed.
All of the people who were in the testator's room on that day testified that Salvador Caprito was alert and knew what he was doing. Several of the people were neutral, uninterested parties, with no reason for any bias. The court could have found from this testimony that the testator executed his will during a "lucid interval."
Plaintiff would have the court ignore all of the lay witnesses who were present in favor of the expert medical opinion of Dr. Ordinario. They cite for support the Succession of Wright, 376 So.2d 589 (La.App. 4th Cir. 1979). The court in that case accepted the medical opinion supporting a determination of incapacity in spite of lay witness testimony to the contrary.
We find that case distinguishable in two ways. First, the medical opinion was based on the fact that incapacity was a result of drugs which were given in great quantity to reduce the severe pain of the testator. An opinion concerning the effect drugs have on the human system is indeed different from an opinion concerning the mental condition caused by a rather uncertain and unpredictable brain condition. Second, in *248 the Wright case, the medical opinions were based on observations nearer in time to the execution of the will.
We find that the trial judge was correct in holding that the plaintiffs failed to overcome the presumption of mental capacity.
Thus, we affirm.
KING, J., dissents and assigns written reasons.
KING, Judge, dissenting.
I dissent from the finding by the majority that the decedent, Salvadore Caprito, possessed the mental capacity to confect his last will and testament.
The evidence is clear that Salvadore Caprito (hereinafter decedent) was 98 years old and suffering from organic brain damage because of deterioration due to old age. The decedent had been judicially determined mentally incompetent to manage his property and financial affairs in an adversarial court proceeding conducted in Forth Worth, Texas in 1977. The decedent was still subject to that guardianship proceeding and was under the custody and control of the guardian appointed by the Court, who was managing his person and property, at the time of his death. The decedent additionally had numerous other health problems, besides organic brain syndrome caused by advanced age, which consisted of congestive heart failure, arterioschlerotic heart disease, chronic anemia, and cerebral arterioschlerotic disease. These medical problems were getting progressively worse and were irreversible. The decedent had been confined to a nursing home for several months prior to his death because he required continuous medical care and attention. The evidence shows that the decedent's days of coherence and orientation were infrequent and that his days of incoherency and incompetency greatly exceeded his days of competency. The medical records of the nursing home generally show that the decedent was hard of hearing, had poor eyesight, was confused and disoriented and that these conditions continued until his death. The medical records in evidence show that on February 15, 1982, the day prior to the confection of decedent's will, that he was disoriented, not responsive, hard of hearing, and blind. On February 17, 1982, the day after the decedent's will was executed, the medical records in evidence describe him as being "totally helpless." Three attempts were made before the decedent's will was finally executed. On the first attempt, in the morning, after the Notary and an attorney talked to decedent they did not think that the decedent was capable of executing a will at that time and for this reason no attempt was made to execute the will. On a second attempt, shortly after noon, the will was unable to be executed when the Notary and an attorney discovered that the decedent had lost or misplaced his eyeglasses and could not see and the Notary and attorney had to return to their office to prepare another will to comply with the provisions of LSA-R.S. 9:2443, which provides for a statutory will for those with sight impairment and those unable to sign their name at the end of the will. The decedent's will was finally executed on the third attempt late in the afternoon of February 16, 1982.
Testamentary capacity should be measured as of the time the will is made. LSA-C.C. Art. 1472; Succession of Lyons, 452 So.2d 1161 (La.1984); Succession of Bush, 292 So.2d 915 (La.App. 1st Cir.1974), writ den., 294 So.2d 837 (La.1974); Stewart v. Branch, 250 So.2d 474 (La.App. 1st Cir. 1971), writ den., 259 La. 905, 253 So.2d 224 (1971). One must be of sound mind to make a donation mortis causa. LSA-C.C. Art. 1475. Testamentary capacity requires that the testator be able to understand the nature of his testamentary act, be aware of the meaning of the particular provisions of his testament, be aware of his estate, and understand the effect of the testamentary provisions upon his estate and the beneficiaries of his bounty. Succession of Lyons, supra, and cases cited therein; Guidry v. Hardy, 254 So.2d 675 (La.App. 3rd Cir.1971), writ den., 260 La. 454, 256 So.2d 441 (1972); Succession of Turner, 157 So.2d 740 (La.App. 2nd Cir.1963). There is *249 a presumption in favor of testamentary capacity and a party alleging lack of testamentary capacity is required to overcome that presumption of capacity by clear and convincing evidence. Succession of Lyons, supra, and the cases cited therein. A will may be valid if executed during a "lucid interval." Succession of Lanata, 205 La. 915, 18 So.2d 500 (1944). The capacity of a testator both prior to and subsequent to the making of his testament is competent evidence to be considered in determining testamentary capacity. Succession of Brown, 251 So.2d 465 (La.App. 1st Cir. 1971). This evidence must be viewed in its totality. Succession of Guidry, 160 So.2d 759 (La.App. 3rd Cir.1964). An interdiction is evidence to be considered along with other competent evidence to determine capacity. Succession of Schmidt, 219 La. 675, 53 So.2d 834 (1951); Succession of Lanata, supra. The appearance of calm and tranquility at the time of execution of the will are not enough to show a lucid interval. Succession of Tyler, 193 La. 480, 190 So. 651 (1939); Aubert v. Aubert, 6 La.Ann. 104 (1851).
In viewing the evidence contained in the record as a whole, including the testimony of the witnesses present at the time of the confection of the decedent's will, I am of the opinion that appellants have overcome by clear and convincing evidence the presumption of the decedent's capacity to execute a will and have proved that the decedent lacked the mental capacity to confect his will on February 16, 1982. At best, the evidence presented by the witnesses, present at the time the will was executed, was that the decedent was tranquil and calm. There is no evidence whatsoever to show a restoration of the decedent's mental capacity for a sufficient length of time to give certainty to his temporary restoration of reason. To the contrary, I find that the evidence clearly and convincingly shows that the decedent, both before, at the time of, and after confection of his will, lacked the mental capacity to reason, to understand the nature of the testamentary act, and to appreciate its effects.
For these reasons, I respectfully dissent.