486 So.2d 260 (1986)
SUCCESSION OF Bonnie Hession ELLIS.
Re Bessie G. Dixon GALE, Plaintiff-Appellee,
v.
William HESSION, et al., Defendants-Appellants.
No. 85-147.
Court of Appeal of Louisiana, Third Circuit.
April 9, 1986.
*261 Calvin T. Guidry, of Cole, Guidry, etc., Lafayette, for defendants-appellants.
Edwards, Stefanski & Barousse, Homer Ed Barousse, Jr., Crowley, for plaintiff-appellee.
Before GUIDRY, FORET and HOOD,[1] JJ.
GUIDRY, Judge.
This is an action to annul a statutory will dated September 30, 1976 for lack of testamentary capacity. The plaintiff in this proceeding is Bessie G. Dixon Gale, the decedent's sole legatee and named executrix under earlier testaments. The defendants are Eugene C. Gilder, dative testamentary executor of the Succession of Bonnie Hession Ellis, and William Hession, who, along with Bessie G. Dixon Gale, is named as legatee under the testament sought to be annulled. The trial court held that the testatrix lacked the requisite testamentary capacity at the time of the making of the will of September 30, 1976 and declared same invalid. Defendant, William Hession, appeals from that judgment.
The sole issue on appeal is whether the trial judge erred in finding that plaintiff-appellee met her burden of proving the incapacity of the testatrix on September 30, 1976, the date the will was confected.

FACTS
Bonnie Hession Ellis died on February 9, 1983, leaving no forced heirs. Upon her death, Mrs. Ellis left three wills. The first will was an olographic will dated January 17, 1967, in which Mrs. Ellis bequeathed all of her property to her cousin, Bessie G. Dixon Gale, plaintiff herein. The second will, a statutory will dated April 17, 1967, contained essentially the same provisions as the first will. Gale was again designated as the sole legatee and as executrix. The third will, which is at issue in the present case, is a statutory will dated September 30, 1976. In that will, Mrs. Ellis left half of all her property to Gale and the other half to William M. Hession, another cousin.
*262 Mrs. Ellis executed the third will while hospitalized in the American Legion Hospital in Crowley, Louisiana. Her hospitalization lasted from September 25, 1976 until October 8, 1976, at which time she was transferred to the psychiatric ward of Our Lady of Lourdes Hospital in Lafayette. She remained at Lourdes for approximately ten days. Upon her release, Mrs. Ellis was placed in a nursing home in Lafayette where she remained until her death on February 9, 1983.
On November 10, 1976, Hession filed a petition for the interdiction of Mrs. Ellis, declaring that she had "been so confused and disoriented that it became necessary to hospitalize her for a period of time and then to temporarily place her in a nursing home so that she can be constantly watched", and that she was "absolutely unable to understand any matters pertaining to business". Mrs. Ellis was interdicted on March 1, 1977. Hession was thereafter appointed as curator.
Following Mrs. Ellis' death, Gale petitioned the district court to have the September 30, 1976 will declared invalid because of Mrs. Ellis' lack of testamentary capacity at the time the will was executed. Gale additionally sought to have either of the 1967 wills admitted to probate and declared to be Mrs. Ellis' last will and testament. Hession reconvened, seeking to have the September 30, 1976 will admitted to probate and declared to be Mrs. Ellis' last will and testament.
By judgment dated November 2, 1984, the trial court ruled in favor of plaintiff, holding that the September 30, 1976 will was invalid due to Mrs. Ellis' lack of testamentary capacity. The judgment further admitted to probate Mrs. Ellis' will of April 17, 1967. Hession appealed.

TESTAMENTARY CAPACITY
We note from the outset that the question of testamentary capacity is a question of fact. The trial court's factual findings in this regard will not be disturbed on appeal unless they are clearly and manifestly erroneous. Succession of Caprito v. Mayhew, 478 So.2d 243 (La.App.3rd Cir. 1985), writ denied, 481 So.2d 1331 (La. 1986); Succession of Price v. Price, 448 So.2d 839 (La.App. 2nd Cir.1984).
The law applicable to a determination of testamentary capacity was set forth by the Supreme Court in Succession of Lyons, 452 So.2d 1161 (La.1984), as follows:
"The capacity to make a will is tested at the time the will is made. LSA-C.C. art. 1472. To make a donation mortis causa, a person must be of sound mind. LSA-C.C. art. 1475. The question is whether the testator understood the nature of the testamentary act and appreciated its effects. Succession of Moody, 227 La.609, 80 So.2d 93 (1955). The burden of proving lack of testamentary capacity is upon the party alleging it. Succession of Schmidt, 219 La.675, 53 So.2d 834 (1951); Succession of Riggio [405 So.2d 513 (La.1981)], supra.
There is a presumption in favor of testamentary capacity...."
The court in Lyons also addressed the issue concerning the appropriate standard of proof required to overcome the strong presumption in favor of testamentary capacity. The Supreme Court found the criminal standard of proof "beyond a reasonable doubt" inappropriate.[2] In determining the proper burden of proof to be the intermediate standard of "clear and convincing evidence", the court in Lyons stated:
"... (such) burden of proof requires more than a "preponderance of the evidence" but less than "beyond a reasonable doubt". The existence of the disputed fact must be highly probable, that is, much more probable than its non-existence.

*263 Louisiana State Bar Association v. Edwins, 329 So.2d 437 (La.1976). This standard is usually employed "where there is thought to be special danger of deception, or where the court considers that the particular type of claim should be disfavored on policy grounds." McCormick on Evidence, Section 340(b), p. 798 (2nd ed. 1972)."
Sufficient soundness of mind can be determined from a showing that the testator knew what he was doing, knew what he had, and knew what he wanted to do with it. Holcomb v. Baker, 459 So.2d 158 (La.App.2d Cir.1984), writ denied, 462 So.2d 196 (La.1984). The capacity of a testator both prior to and subsequent to the making of his testament is competent evidence to be considered in determining testamentary capacity, since the actions, conduct and physical and mental condition of the testator before and after execution of the will are of probative value in deciding testamentary capacity. Succession of Brown, 251 So.2d 465 (La.App.1st Cir. 1971); Succession of Keel, 442 So.2d 691 (La.App. 1st Cir.1983).
With these established principles in mind, we consider whether the trial court correctly found that plaintiff established by clear and convincing evidence that Mrs. Ellis lacked testamentary capacity on September 30, 1976.
Hazel Truax and Anatole Latiola, both friends and long-time neighbors of Mrs. Ellis, testified regarding Mrs. Ellis' deteriorating mental condition commencing in the summer of 1976. Both testified that during that time Mrs. Ellis told them stories of "little people" with capes who would enter her house and demand that she cook for them. Both testified that Mrs. Ellis actually prepared elaborate meals for these imaginary "little people". They stated that Mrs. Ellis was sincere in her belief as to the existence of these "little people". Truax also related an incident when Mrs. Ellis ran over to her house in the nude and other incidents when Mrs. Ellis spoke of conversations which she had had with her deceased parents. Truax and Latiola both testified that Mrs. Ellis' condition seemed to worsen with the passage of time and that Mrs. Ellis was no longer the talkative, friendly person that they had known over the past twenty years. Neither Truax nor Latiola saw Mrs. Ellis once she was admitted to the hospital in Crowley.
Alma Sizer, a life-long friend of Mrs. Ellis, visited with her about once a week during the summer of 1976. Mrs. Ellis also told Sizer about the "little people" and even claimed to have seen them once at Sizer's home in Eunice. Sizer stated that Mrs. Ellis was very sincere when she spoke of the "little people". Sizer testified that Mrs. Ellis "seemed to be well physically, but she was very mixed up mentally". Mrs. Ellis also discussed the "little people" with Sizer during her hospital stay in Crowley.
Plaintiff, Bessie Gale, also testified as to Mrs. Ellis' mental state just prior to her hospitalization in September, 1976. Gale testified that Mrs. Ellis visited her and her family in Seabrook, Texas in June of 1976 and that Mrs. Ellis "wasn't herself then". Gale again saw Mrs. Ellis in the Crowley hospital, subsequent to the execution of the will, and found her to be unusually quiet. Gale was unable to remember any specific conversations which she might have had with Mrs. Ellis during this period of time. She did note that every time she visited Mrs. Ellis in the hospital, Mr. and Mrs. Hession were there.
Mrs. Ellis was admitted to the American Legion Hospital in Crowley upon the advice of her family doctor, Dr. Martin F. Samson. Dr. Samson had been Mrs. Ellis' physician since 1963. At trial, Dr. Samson explained in deposition why he had Mrs. Ellis hospitalized on September 25, 1976 as follows:
"About three months before she was confinedI noticed she was getting a little bit confused and somewhat depressed. Then three weeks before, she was really getting quite, quite off. She would tell me stories about people coming into her house. That she would have to feed them. And that these people were small, about two feet in height. She says she *264 fed them three or four times. And the last time they came inthat was another time. She got real mad, started throwing all of her furniture out of the front door and some of it outside because of these little people that were coming in her house. They got her mad. That's probably what initiated her admission to the hospital was the furniture, throwing the furniture out at these little men. I checked further and none of the neighbors could establish that she had any visitors. They said they just couldn't imagine four or five times people coming into her house and she having to feed them...."
Dr. Samson testified that treatment of Mrs. Ellis consisted of bedrest, a little sedation and vitamins. While in the hospital, Mrs. Ellis spoke to Dr. Samson of the "little people". She also complained about being unable to sleep at night because of the loud noises coming from the room next to hers. Dr. Samson checked this story with the nurses on duty and found the story to be a fabrication. Mrs. Ellis also told Dr. Samson of birds flying around her room and laying eggs on her bed; speaking to her grandmother who had long since been deceased; and, mistaking a friend as being her deceased brother. Dr. Samson visited with Mrs. Ellis every day while she was hospitalized. He opined that an untrained person would not have been aware that Mrs. Ellis was a sick person, but added that "if you talked to her enough, you'd soon find out a few things maybe might not be right".
When asked whether he thought Mrs. Ellis was capable of making business decisions or handling business affairs, Dr. Samson responded,
"From what I saw and at the time all this was going on, I would feel that she couldn't. Not from the things that happened. Now I can't make any prediction of how she would been [sic] after. But up until the time she left the hospital while she was in the hospital up until the time that she left, I'd say definitely not able to handle anything."
Dr. Samson testified that he did not think Mrs. Ellis would have been capable of understanding legal documents pertaining to the disposition of her property. He stated that, "just ordinary conversation was a little bit difficult to get things right with her."
Dr. Samson did testify that Mrs. Ellis willingly admitted herself into the hospital upon his recommendation and that she appeared to understand what she was doing at the time. He also stated that Mrs. Ellis continued to recognize him during her stay in the hospital. Dr. Samson was unable to answer absolutely whether Mrs. Ellis had any lucid moments in the hospital when she understood what was going on. He stated that she didn't have "episodes" every time he saw her, but that "more likely than not" she was incapable of having any lucid moments while in the hospital. Dr. Samson did not recall any specific conversations with Mrs. Ellis on September 30, 1976.
In a progress letter dated October 5, 1976, Dr. Samson concluded about Mrs. Ellis:
"It appears that the patient has been having visual and auditory hallucinations resulting in complete confusions [sic] at times and disorientations [sic]. She has also been having delusions. The patient is apparently not aware of her mental state."
Another life-long friend of Mrs. Ellis, Thelma Davis Bilbo, testified about Mrs. Ellis' accounts of the "little people", both prior to and during her hospitalization in Crowley. Bilbo was visiting with Mrs. Ellis on the day that she was admitted to the hospital. She and her husband had driven to Mrs. Ellis' home in Egan upon Mrs. Ellis' insistence. Bilbo stated that upon arrival at Mrs. Ellis' house, they saw that Mrs. Ellis had thrown a great deal of her furniture onto her front porch. Bilbo immediately called Dr. Samson and drove Mrs. Ellis to the hospital.
Bilbo visited with Mrs. Ellis every day while she was hospitalized. Bilbo also testified about Mrs. Ellis' accounts of birds flying in her room, noises that kept her *265 awake at night and conversations with her deceased parents. Bilbo felt that Mrs. Ellis was sincere when she related these stories and that she actually believed such had occurred. Bilbo was unable to recall any specific conversation with Mrs. Ellis on September 30, 1976.
Defendant, William Hession and his wife also testified at trial. The Hessions stated that during the summer of 1976 they visited with Mrs. Ellis occasionally. Mrs. Hession testified that Mrs. Ellis spent three days with them at their home in Sunset in July of 1976 and that Mrs. Ellis was capable of carrying on a normal conversation and spoke to them about her business affairs. Mrs. Ellis never told them any stories which would lead them to believe that she was not all right emotionally. The Hessions again saw Mrs. Ellis on Labor Day weekend. At that time, Mrs. Ellis was concerned about some business matters, but otherwise did not act out of the ordinary. The Hessions visited with Mrs. Ellis every day while she was hospitalized in Crowley, and she never told them about the birds or the loud noises at night. They testified that because of her concern over her business affairs and her bills, Mrs. Ellis had a power of attorney drawn up in the hospital so that Mr. Hession could manage her affairs during her hospital stay. Mrs. Ellis then requested Mr. Hession to consult an attorney and have a new will drawn up for her. On September 30, 1976, Mrs. Ellis signed a statutory will in front of a notary and two witnesses. The Hessions stated that Mrs. Ellis seemed alert and able to understand what she was doing at the time. Mrs. Hession testified that it wasn't until the last three days of her stay in the hospital that Mrs. Ellis began to get depressed and cry.
With regard to Mr. Hession's petition to have Mrs. Ellis interdicted on November 10, 1976, Hession testified that at that time he did not feel that Mrs. Ellis had the capacity and understanding to handle her own affairs. He testified that he decided to have her interdicted in order to protect her property for her.
Grace Deshotels, the notary on the September 30, 1976 will, testified at trial that Mrs. Ellis followed along on her copy of the will while Deshotels read it to her. Deshotels asked Mrs. Ellis if she understood the will and Mrs. Ellis responded affirmatively. Mrs. Ellis acknowledged to the witnesses that such was her last will and testament. Deshotels noted that Mrs. Ellis did not do or say anything which would have led her to believe that she did not understand what was going on.
John Craton, one of the witnesses on the will, testified that he did not have any independent recollection of meeting Mrs. Ellis on September 27, 1976, the day Mrs. Ellis signed the power of attorney. He did recall going to the hospital on September 30, 1976 to have Mrs. Ellis sign the will. The Hessions were at the hospital when he got there. Although Craton could not remember any specific conversation which transpired while at the hospital, he did remember Mrs. Ellis following along on a copy of the will during the reading of the will. Craton felt at the time that Mrs. Ellis understood what was going on and that he would not have acted as a witness to the will had he thought otherwise. The other witness to the will did not testify at trial as it was stipulated between the parties that the witness had no independent recollection of the proceedings.
While still in the Crowley hospital, Mrs. Ellis was examined by Dr. Hugh P. Wyatt, a psychiatrist, upon the request of Dr. Samson. Dr. Wyatt testified at trial that Mrs. Ellis' general state on October 6, 1976 was psychotic. As per his report of that examination, Dr. Wyatt found her mental status to be "very significant in terms of confusion, disorientation, and memory defects; was also significant in terms of the delusions and hallucinations that were present and also a significant amount of confabulations". Dr. Wyatt diagnosed her condition as Korsakoff's Syndrome, a type of chronic brain syndrome usually associated with chronic alcoholism which causes impairments of brain function, particularly to the temporal lobes of the brain. Dr. *266 Wyatt explained that Korsakoff's Syndrome usually develops gradually over a period of time. He also stated the following regarding treatment of the condition:
"The treatment of the Korsakoff's Syndrome with theor from alcohol abuse, has one of the worst prognoses. If it had been organic an impairment to the temporal lobes of the brain, say from an infectious process, then the prognosis would have been a lot better. But from the alcohol, of course, the effects of alcohol on the brain, on the brain cells, is irreversible as a rule. So the prognosis, I feel, would have been bad, assuming that my impression that this was primarily related to alcohol abuse."
Dr. Wyatt opined that, due to the gradual nature of the Syndrome, Mrs. Ellis' mental condition would have been the same had he examined her the previous week on September 30, 1976. Because of the confabulations,
Dr. Wyatt observed that it was improbable that Mrs. Ellis would have had a lucid time during the week prior to his examination. When questioned about whether a lay person would be able to detect Mrs. Ellis' illness, Dr. Wyatt stated:
"She could appear to be normal even to a professional, you know, if that professional did not know what to look for specifically and if you did not ask a lot of the same questions. Because responsesat different times.Because responses, as I say in confabulation, responses may seem reasonable and real to the person who is asking the questions. It's only as you know more detail and get more familiar that I think you realize that none of this is true at all."
The testimony of Dr. Lou Fink, a medical doctor specializing in psychiatry, was submitted by deposition. Dr. Fink first examined Mrs. Ellis on October 8, 1976, upon her admittance to Our Lady of Lourdes Hospital in Lafayette. Dr. Fink also diagnosed Mrs. Ellis' condition as Korsakoff's Psychosis and also Wernick's encephalopathy, both conditions associated with chronic alcoholism. Dr. Fink opined that it would have been impossible for Mrs. Ellis to understand or comprehend business or legal matters during the times that she examined Mrs. Ellis. Dr. Fink observed that: "... There would be some days when she would seem a little clearer than others. Some days when it would be worse than others but she did not recover. She did not recover. There would be days when she was clear and days when she was less clear...". Dr. Fink noted however that even on the "more clear" days, Mrs. Ellis would still not have the capacity to understand business and legal affairs. Dr. Fink was of the opinion that Mrs. Ellis would not have been capable of understanding business or legal affairs on September 30, 1976. When questioned whether Mrs. Ellis had lucid moments at times, Dr. Fink stated, "Lucid in that she woulddid not seem as confused, you know, was less disoriented, seemed to remember more things. Not lucid in the sense that you and I are lucid now". As mentioned at the outset of this opinion, a determination of testamentary capacity is a finding of fact which should not be disturbed on appeal absent clear error. Our meticulous examination of the record evidence, which we have fairly but briefly summarized, prompts our conclusion that the trial court did not err in determining that Mrs. Ellis lacked testamentary capacity on September 30, 1976. The medical experts were unanimously of the opinion that Mrs. Ellis lacked testamentary capacity on September 30, 1976. The lay testimony of several neutral, uninterested parties, with no reason for bias, corroborates this expert opinion testimony. Opposed to this evidence is the testimony of Mr. and Mrs. Hession that Mrs. Ellis was rational and understood the consequences of the will which she executed on September 30, 1976 and that of the notary and witness who observed no unusual behavior on the part of Mrs. Ellis. As to the latter, the appearance of calm and tranquility at the time of execution of a will are not enough to show a lucid interval. Succession of Tyler, 193 La.480, 190 So. 651 (1939); Aubert v. Aubert, 6 La.Ann. 104 *267 (La.1851). As to the former, reasonable evaluations of credibility should not be disturbed on appeal absent clear error.
Accordingly, for the foregoing reasons, we affirm the judgment of the trial court. All costs of this appeal are to be paid by appellant, William Hession.
AFFIRMED.
NOTES
[1] Judge Warren Hood of the 14th Judicial District Court participated in this decision as Judge Pro Tempore of the Third Circuit Court of Appeal.
[2] This court as well as other circuits in the State had previously required the stringent criminal standard of proof, "beyond a reasonable doubt". Succession of Budwah, 441 So.2d 39 (La.App. 3rd Cir.1983); Succession of Collins v. Hebert, 377 So.2d 516 (La.App. 3rd Cir.1979), writ denied, 379 So.2d 15 (La.1980); Succession of McKay v. Mount, 449 So.2d 189 (La.App. 3rd Cir.1984).