536 So.2d 676 (1988)
Elmer NAQUIN, Plaintiff-Appellant,
v.
Lillian Dekerlegand HILE, Administratrix of the Succession of Marie Rose Naquin, Defendant-Appellee.
No. 87-1053.
Court of Appeal of Louisiana, Third Circuit.
December 14, 1988.
*677 David A. Blanchet, Lafayette, for plaintiff-appellant.
Fruge & DeJean, Ellen M. Walker, Lafayette, for defendant-appellee.
Before GUIDRY, FORET and KNOLL, JJ.
KNOLL, Judge.
Elmer Naquin appeals the dismissal of his action against Lillian Dekerlegand Hile, the administratrix of the Succession of Marie Rose Naquin, to annul the probated statutory testament of Marie Rose Naquin (hereafter the deceased) and to set aside the judgment of possession which recognized Mrs. Hile as the sole legatee of the deceased. The trial court found: (1) the testament was in authentic form; (2) Naquin failed to prove that the deceased lacked the necessary testamentary capacity at the time the testament was executed; (3) LSA-R.S. 9:2442 requires only that the testator know how to and is physically able to read, not that she actually have read the statutory testament at the time of execution; and, (4) Naquin failed to prove the deceased was physically unable to read at the time of the execution of the testament.
Naquin contends that the trial court erred in holding: (1) that a statutory will prepared in accordance with LSA-R.S. 9:2442 could be perfected by a person who was physically unable to read at the moment of execution; and (2) as a matter-of-fact that the deceased possessed the requisite mental capacity to execute a last will and testament. We affirm.

FACTS
Marie Rose Naquin, a retired school teacher fluent in English and French, died at Our Lady of Lourdes Hospital on March 4, 1984, at the age of 88. The deceased was never married, had no children, and was survived only by nieces and nephews.
The deceased lived alone, for the most part, in Carencro until March 1, 1983, when she was hospitalized at Our Lady of Lourdes Hospital in Lafayette for congestive heart failure, and an injury to her right leg. Upon discharge from the hospital, the *678 deceased resided first in the Lafayette Guest House for thirty days, and then was transferred to Bethany Nursing Home on April 4, 1983, where she remained until her death almost a year later.
On July 18, 1983, approximately 8 months prior to her death, the deceased executed a statutory will in the presence of G. Paul Marx, an attorney and notary public, with Anna Jane Marks and Margaret Bourque serving as witnesses. In the will the deceased designated Mrs. Hile, a niece of the deceased, as her sole legatee and the administratrix of her succession.
The district court probated the deceased's last will and testament on May 18, 1984, and on that same date signed a judgment of possession adjudicating the deceased's entire estate to Mrs. Hile.
Naquin, a nephew of the deceased, instituted an action to annul the decedent's last will and testament, as well as the judgment of possession, on August 18, 1984, within three months of the date of probate. Naquin's contentions were that the deceased lacked the mental capacity to execute a will, that the deceased's eyesight was so impaired that she was physically unable to read at the time her will was executed, and that the deceased's last will and testament was not executed in accordance with LSA-R.S. 9:2443 to qualify as a will executed by a person with a vision impairment.

ABILITY TO READ
Naquin first contends that the trial court erred in holding that a statutory will prepared in accordance with LSA-R.S. 9:2442 could be perfected by a person who was physically unable to read at the moment of execution. The trial court did not so hold. Rather, the trial court held in written reasons for judgment, that plaintiff failed to carry his burden of proof that the decedent was physically unable to read at the time the will was executed. Finding no manifest error in the trial court's conclusion that the deceased could read at the time her will was executed, we affirm.
In its written reasons for judgment, the trial court ultimately concluded, "[T]he Court finds the plaintiff [Naquin] has not met his burden of proof that the decedent was physically unable to read at the time the will was executed."
The capacity to make a will is tested at the time the will is made. LSA-C.C. Art. 1472; Succession of Caprito v. Mayhew, 478 So.2d 243 (La.App. 3rd Cir.1985), writ denied, 481 So.2d 1331 (La.1986). One of the requirements of LSA-R.S. 9:2442 is that the testator must be physically able to read at the time the testament is executed. Succession of Budwah, 441 So.2d 39 (La. App. 3rd Cir.1983). The testator's ability to read is an element of testamentary capacity. Id. at page 41. The burden of proving lack of testamentary capacity is upon the party alleging it. Succession of Schmidt, 219 La. 675, 53 So.2d 834 (1951).
There is a presumption in favor of testamentary capacity. Succession of Mithoff, 168 La. 624, 122 So. 886 (1929). A party alleging lack of testamentary capacity must overcome the presumption of capacity by clear and convincing evidence. Succession of Lyons, 452 So.2d 1161 (La.1984). Proof by clear and convincing evidence "requires more than a `preponderance of the evidence' but less than `beyond a reasonable doubt'. The existence of the disputed fact must be highly probable, that is, much more probable than its non-existence." Id. at page 1165.
Naquin relies on expert ophthalmological and optometric testimony, emphasizing that Dr. Rickey Lacombe, an optometrist who examined the deceased on July 12, 1983, six days prior to the execution of the will, found the deceased's best corrected near vision was 20/200 and opined that the deceased could not have read the type size of her last will and testament with her eyeglasses.
Sister Vivian Dekerlegand, a niece of the deceased and Mrs. Hile's sister, and a member of a religious order of nuns, and Anna Jane Marks, a close friend of the deceased, brought the deceased to the Carencro Eye Clinic, operated by Dr. Lacombe, six days before the will was executed. By deposition Dr. Lacombe testified that the deceased's main objective "was to read". According *679 to Dr. Lacombe, the deceased suffered from senile cataracts and macular degeneration of the eyes. Dr. Lacombe found that the deceased's visual acuity at near distances was 20/200. However, he did not change her eyeglass prescription because he felt the cost of the new pair of eyeglasses did not justify the slight improvement they would afford. Dr. Lacombe testified that even if he had prescribed stronger lenses, the deceased would have been unable to read the last will and testament. In order to pick and choose letters, Dr. Lacombe felt that the deceased would have needed to use at least a four (4) power magnifying glass in conjunction with her eyeglasses. Dr. Lacombe further stated that picking and choosing letters is not necessarily reading: when a person picks and chooses letters with a magnifying glass it must be done one at a time, and then the person must first form those letters into words, and then convert those words into a sentence.
Anna Marks and Sister Vivian testified that the deceased wore her eyeglasses at the execution of the will, and did not have a magnifying glass with her.
Present at the will execution were G. Paul Marx, an attorney, his secretary, Margaret Bourque, Mrs. Hile, Sister Vivian and Anna Marks. They all testified that the deceased did not use a magnifying glass at the will execution. However, Mr. Marx, Anna Marks, and Mrs. Hile testified that the deceased held the last will and testament, or a copy of it, with both hands at a standard reading distance while Mr. Marx read the document aloud.
The trial court accepted Dr. Richard Bourgeois as an expert ophthalmologist. Dr. Bourgeois did not treat the deceased, but testified after examining the depositions and medical records of Dr. Sweeny Smith, the deceased's treating optometrist in 1981 who first diagnosed the beginning of cataracts, and Dr. Lacombe. Dr. Bourgeois stated that the combination of macular degeneration and the cataracts was the cause of the deceased's near vision limitations, even with eyeglasses. He further stated, after examining a copy of the deceased's last will and testament, that the deceased who had a best acuity of 20/200 could not read that document. However, he also testified that a person with the deceased's visual acuity was not blind because she would be able to avoid running into large objects and could recognize individuals without clearly distinguishing their features. Furthermore, he stated that although the deceased's vision over a short period of time remained fairly constant, it was nonetheless subject to slight fluctuations.
Naquin contends the trial court erred in rejecting the medical testimony, particularly that of Dr. Lacombe who examined the deceased shortly before her execution of the will. A trial court may not lightly disregard an expert's uncontradicted testimony regarding underlying facts, not impugned by lack of credibility. Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967). However, expert opinion as to ultimate facts, even uncontradicted, is not binding on the trial court. Lester v. Employers Mut. Liability Ins. Co. of Wis., 333 So.2d 672 (La.App. 3rd Cir.1976), writ denied, 337 So.2d 875 (La.1976). Although experts may aid the trial court in the determination of ultimate facts, the final conclusions drawn from those facts belong exclusively to the trier of fact.
Where there is evidence before a trier of fact which, after the trial court's evaluation of credibility, furnishes a reasonable factual basis for the trial court's findings, the appellate court, on review, should not disturb this factual finding in the absence of manifest error. The reviewing court must give great weight to the factual conclusions of the trier of fact, and where there is a conflict in the testimony, reasonable evaluations of the credibility and reasonable inferences of fact should not be disturbed, even though the appellate court may feel its own evaluation and inferences are reasonable. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La. 1973).
From the outset we note that the testimony of the notary public before whom a will has been executed is regarded as carrying special credence by courts in disputes *680 about the testamentary capacity of the testator. Succession of Budwah, supra; Succession of Dubos, 422 So.2d 444 (La.App. 4th Cir.1982), writs denied, 429 So.2d 132, 160 (La.1983). Mr. Marx testified that he met with the deceased prior to the execution of the will to satisfy himself of her capabilities and her mental capacity. At this conference, he stated that he was impressed by the deceased's appearance and her demeanor, and at the end she never gave him any indication whatsoever that she had any vision problems. He testified that at the time the will was actually executed, he read the will aloud, first having given the deceased a copy, or the original, for her consideration. The deceased held the document up and to the best of his recollection, appeared to read the document along with him as he read it aloud. The deceased indicated to him and the witnesses that this was her last will and testament, and signed her name unassisted on the two lines of the document. Throughout his testimony, Mr. Marx emphasized that had the deceased given him any indication that she had vision problems, he would have delayed the execution of the will and done further investigation.
The witnesses to the will corroborated Mr. Marx's testimony.
In addition, the trial court was assisted with the testimony of the deceased's personal physician, Dr. J. Charles Dugal, a general practitioner, as well as persons who saw her daily or, at least, regularly.
Dr. Dugal treated the deceased from November 1980 until early 1983 when she was admitted to the nursing home. He testified that he was never under the impression that the deceased had any vision problem, and noted that she was extremely mobile for her age.
The trial court heard the testimony of Sister Lorraine Marchand, the administratrix of Bethany Nursing Home where the deceased resided, Angela Boutte, an aide at the nursing home, Mrs. Ruby Wortman, a retired school teacher who often visited the deceased, Mr. and Mrs. Leonce Connelly, friends of the deceased, Ms. Louise Smith, the deceased's niece, as well as Sister Vivian and Anna Marks, who visited the deceased approximately three or four times weekly. These witnesses testified that the deceased was seen with prayer cards and books not only on her bed stand, but also in her hands or open in her lap. Donna B. Gardiner, a hall nurse at the nursing home who was called as a witness for Naquin, corroborated the testimony that the deceased would hold prayer books open and appear to be reading. Ms. Smith testified that for months she brought the deceased's mail from her Carencro home to the nursing home in Lafayette, and the deceased would peruse the mail, examining her bank statements and indicating, at times, what bills needed to be paid; she also testified about how the deceased would like to go into the garden area outside the nursing home to show her the various flowers and to point out the squirrels that would run about the yard. Sister Vivian testified that the deceased received periodicals and newspapers through the mail, and the two of them would often discuss articles from them.
In addition to the testimony of Donna Gardiner and the medical evidence, Naquin testified, as did Mr. and Mrs. Wilfred Naquin, Naquin's brother and his brother's wife. Mr. and Mrs. Wilfred Naquin had not seen the deceased for a number of years, and only saw the deceased one time. They testified that the deceased did not recognize them, and became lost or confused about how to get about the halls of the nursing home. Naquin testified that he visited the deceased three or four times a week, a fact disputed at trial. He testified that the deceased never recognized him, and that she was generally confused when he visited.
The record shows that the trial court was presented with lay testimony regarding the deceased's vision which conflicted with the medical opinion about the limitations of the deceased's near vision acuity. After carefully reviewing the record, particularly the testimony of the various persons who saw the deceased on a regular basis, we cannot say that the trial court was manifestly erroneous in its conclusion that Naquin failed to prove by clear and convincing evidence that the deceased was unable to read.

*681 MENTAL CAPACITY
Naquin next contends that the trial court erred in finding that the deceased had the requisite mental capacity to make a last will and testament. He argues that the choice of the alternate legatee, Mr. Hile, and the testatrix's failure to make certain particular bequests are indicative of her diminished mental state. We disagree.
The question of testamentary capacity is a question of fact, and the trial court's resolution of that issue will not be disturbed on appeal unless it is clearly and manifestly erroneous. Succession of Price v. Price, 448 So.2d 839 (La.App. 2nd Cir. 1984).
To make a donation mortis causa, a person must be of sound mind. LSA-C.C. Art. 1475. Testamentary capacity is always presumed, and thus a presumption exists in favor of the validity of the will. Guidry v. Hardy, 254 So.2d 675 (La.App. 3rd Cir. 1971), writ denied, 260 La. 454, 256 So.2d 441 (La.1972). In determining mental capacity, the question presented is whether the testator, at the time of the execution of the will, understood the nature of the testamentary act and appreciated its effects. Succession of Lyons, supra. The party alleging the lack of mental capacity has the burden of proving the allegation by clear and convincing evidence. Id. at page 1166.
In Succession of Keel, 442 So.2d 691 (La.App. 1st Cir.1983) at page 693, our brethren of the First Circuit stated:
"In determining testamentary capacity, the courts will consider the physical and mental condition of the testator not only at the time of execution, but also prior and subsequent thereto, since the actions, conduct and physical and mental condition of the testator before and after the execution of the will are of probative value in deciding testamentary capacity."
See also Succession of Caprito, supra.
The appearance of calm and tranquility at the time of execution of the will is not enough to show a lucid interval. Succession of Ellis, 486 So.2d 260 (La.App. 3rd Cir.1986). The courts have also placed importance on the testator's knowledge of what he was doing, what he had and what he wanted to do with it in determining testamentary capacity. Id. at page 263. A court may consider undue influence or intimidation only insofar as it tends to show lack of testamentary capacity. Guidry, supra at page 681.
We have carefully examined the detailed testimony relied upon by Naquin, and find no merit to his contentions. The testimony of the notary public before whom the will was executed, as well as the witnesses to the testament, clearly indicates that the deceased was aware of what she was doing, and the will reflected the testatrix's intent. It is particularly clear that the deceased designated Mrs. Hile as the primary beneficiary at all times. With regard to the designation of the alternate beneficiary, Mr. Hile, although the deceased was firm in her wishes that his family not later inherit her property, the record is void of any testimony that she did not want him to inherit her property should Mrs. Hile be unable to accept.
Furthermore, with only the exception of Naquin and his family who testified that the deceased was always confused when they visited, and the testimony of Donna Gardiner that the deceased was not senile, but was confused 20% of the time, the testimony preponderates that the deceased recognized individuals regularly and consistently, engaged in normal conversations, knew what she was doing, and was not senile.
With regard to the exclusion of certain particular bequests to the Roman Catholic Church and to certain family members, we have examined the testimony of the various witnesses to the will and find no evidence to indicate that the exclusion of particular bequests is indicative of lack of mental capacity on the part of the testatrix.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Naquin.
AFFIRMED.